**CONCORD REAL ESTATE CDO 2006–1, LTD., and Concord Real Estate CDO 2006–1, LLC, Plaintiffs,**

v.

**BANK OF AMERICA N.A., as Trustee under the Indenture Agreement referred to herein, Defendant.**

C.A. No. 5219–VCL.

Court of Chancery of Delaware.

Submitted: April 21, 2010.
Decided: May 14, 2010.

Gregory P. Williams, Rudolf Koch, Jennifer J. Veet, Kevin M. Gallagher, Richards, Layton & Finger, P.A., Wilmington, DE, for Plaintiffs Concord Real Estate CDO 2006–1, Ltd., and Concord Real Estate CDO 2006–1, LLC.

Andre G. Bouchard, Sean M. Brennecke, Bouchard Margules & Friedlander, P.A., Wilmington, DE; Robert C. Micheletto, Jayant W. Tambe, Marguerite S. Dougherty, Jones Day, New York City, for Defendant Bank of America N.A.

## OPINION

LASTER, Vice Chancellor.

The plaintiffs are single-purpose entities that issued notes as part of a collateralized debt obligation known as Concord Real Estate CDO 2006–1 (the "Concord CDO"). The notes were issued subject to the Indenture Agreement for Concord Real Estate CDO 2006–1 dated December 21, 2006 (the "Indenture" or "IA"). The Indenture refers to plaintiff Concord Real Estate CDO 2006–1, Ltd. as the Issuer and plaintiff Concord Real Estate CDO 2006–1, LLC as the Co–Issuer. Defendant Bank of America N.A. has been sued in its capacity as the Trustee under the Indenture (as the successor by merger to LaSalle

Bank N.A.). I refer to the parties using these designations. The Trustee also serves as Paying Agent, Calculation Agent, Transfer Agent, Custodial Securities Intermediary, Backup Advancing Agent, and Notes Registrar, all of which are roles defined by the Indenture.

The Issuer and Co–Issuer seek a declaration that they validly delivered for cancellation certain notes that their affiliate surrendered without consideration and with the intent that the obligations represented by the notes be discharged. The Trustee declined to cancel the notes on the ground that the Indenture did not provide for cancellation under those circumstances. Whether or not the notes should have been canceled determines how funds subsequently flow to the holders of various securities governed by the Indenture. If the notes remained outstanding, then the Concord CDO failed to meet one of its coverage tests, and funds must be diverted to redeem senior notes until all of the senior notes are redeemed or the coverage test is met. If the notes should have been canceled, then the Concord CDO passed its coverage tests, and funds will continue to flow to the holders of securities without any redemption of senior notes.

I hold that the notes at issue were discharged when the holder surrendered them voluntarily to the obligors with the intent that the notes be canceled. The Issuer and Co–Issuer properly delivered the discharged notes for cancellation to the Trustee in its capacity as Notes Registrar. Under the plain language of the Indenture, the notes at issue were not "Outstanding" as of January 5, 2010, the date on which they were delivered for cancellation. I therefore grant the plaintiffs' motion for summary judgment.

## I. FACTUAL BACKGROUND

The parties have cross-moved for summary judgment. Neither side points to a disputed issue of fact material to either motion. Accordingly, pursuant to Court of Chancery Rule 56(h), the case is deemed submitted for decision on the written record. I find the facts to be as follows.

### A. Concord Real Estate CDO 2006–1

In March 2006, Winthrop Realty Trust and Newkirk Realty Trust, Inc. formed Concord Debt Holdings LLC ("Concord Sponsor") to act as a sponsor of collateralized debt obligations and other structured financial products. In December 2006, Concord Sponsor put together the Concord CDO.

To assemble the Concord CDO, Concord Sponsor formed the Issuer and the Co–Issuer. The Issuer and Co–Issuer then issued notes with a face value of approximately $413,850,000 (the "Notes"), divided into tranches designated from Class A through Class H. Each Note will mature at par in December 2046 unless earlier redeemed or repaid. During the life of the Notes, each earns interest at a fixed spread over a published reference rate. The Issuer and Co–Issuer also issued $51,150,000 of preferred shares (the "Preferred Shares").

The Notes and Preferred Shares were issued subject to the Indenture, which is a lengthy and complex document. Its definitions alone cover 78 pages. Its substantive provisions span another 174 pages. It incorporates 15 schedules and 12 exhibits.

The Notes were not registered under the Securities Act of 1933. *See* IA §§ 2.2 & 2.5. Consequently, they were offered only to highly sophisticated investors who could purchase the Notes under exemptions to the United States securities laws. The investors fell into two basic groups: (i) foreign persons who acquired the Notes via offshore transactions in reliance on

Regulation S and (ii) "qualified institutional buyers" within the meaning of Rule 144A who were also "qualified purchasers" as defined in Section 2(a)(51) of the Investment Company Act of 1940. The Indenture contains transfer restrictions that prevent the transfer of the Notes to any person who does not meet these qualifications. *See* IA § 2.5.

The Class G and H Notes and the Preferred Shares were not offered in the private placement. Concord Debt Funding Trust ("Concord Trust"), an affiliate of Concord Sponsor, holds the Preferred Shares and the Class G and H Notes.[1]

Using the funds from the issuance of the Notes, the Issuer and Co–Issuer acquired a mixed portfolio of assets, consisting of mortgage loans, mezzanine loans, real estate bank loans, collateralized mortgage-backed securities, other CDO securities, REIT debt, and other real estate related interests. The Indenture defines the assets as the "Collateral Interests." *Id.* § 1.1 ("Definitions") at 20. Cash flow from the Collateral Interests is used to make payments on the Notes. The Indenture also allows specified amounts of cash flow to be reinvested in the Concord CDO and used to acquire other Collateral Interests. *Id.* § 12.2.

The different classes of Notes enjoy different priorities in the cash flows generated by the Collateral Interests, and they pay different rates of interest to compensate for their relative risk. So-called "super senior Notes"—the higher tranches— have first priority in payments of interest and principal but pay a lower rate of interest. So called "mezzanine Notes" are subordinate to the senior notes but pay a higher rate of interest. The equity tranche of Preferred Shares has the lowest priority of payment and receives any remaining cash flows. The sequential payout of available cash as it flows down the tiers of securities is commonly referred to as the "waterfall." Section 11.1 of the Indenture sets forth a detailed waterfall for distribution of proceeds to the various holders of the Issuer and Co–Issuer's securities.

## B. The Coverage Tests

The distribution of funds under the waterfall changes depending on the outcome of two coverage tests: the Par Value Test and the Interest Coverage Test. *See generally* IA § 11.1. The Par Value Test resembles a leverage ratio, and the Interest Coverage Test resembles a debt service coverage ratio. *See id.* § 1.1 at 11–12, 46–48, 59. For purposes of this dispute, only the Par Value Test is relevant.

Par value testing is performed at the Class A/B/C level, Class D level, Class E level, Class F level, and Class G level. *See id.* at 59 & *id.* § 11.1. The Par Value Test works the same way at each level, except that each level has its own compliance threshold.

For example, the Class F Par Value Test is defined as "[t]he test that is met as of any Measurement Date on which any Class F Notes remain Outstanding if the

---

1. It appears that Concord Trust originally acquired the Preferred Shares and that Concord Real Estate CDO 2006–1 Depositor, LLC, another affiliate of Concord Sponsor, acquired the Class G and H Notes. The Class G and H Notes were later transferred to 111 Debt Acquisition–Key LLC, a subsidiary of Concord Trust. On January 5, 2010, 111 Debt Acquisition–Key LLC surrendered all of the Notes at issue, consisting of the Class G and H Notes and certain other Notes. All of the Notes at issue subsequently were transferred to Concord Trust. There is no dispute about Concord Trust's ultimate ownership of the Notes, regardless of whether at times it was indirect. For simplicity, I refer in this opinion only to Concord Trust, without differentiating among Concord Trust and its subsidiaries.

Class F Par Value Ratio on such Measurement Date is equal to or greater than 118.0%." *Id.* § 1.1 at 17. The Par Value Ratio thresholds for the Class A/B/C, Class D, Class E, and Class G tests are, respectively, 135%, 126%, 122%, and 113%. *Id.* at 12, 14, 15, 18. The Class F Par Value Ratio is defined as follows:

> As of any Measurement Date, the number (expressed as a percentage) calculated by dividing (a) the Net Outstanding Portfolio Balance on such Measurement Date by (b) the sum of the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes and the amount of any unreimbursed Interest Advances and any Class F Deferred Interest.

*Id.* at 16–17. The Par Value Ratio for the Class A/B/C, Class D, Class E, and Class G tests are defined similarly, except that "Aggregate Outstanding Amount" is defined only with reference to the level of the security being tested and those classes senior to it. *Id.* at 11–12, 14, 15, 18.

The Par Value Ratio is thus a fraction with two inputs: the Net Outstanding Portfolio Balance,[2] which serves as the numerator, and the Aggregate Outstanding Amount,[3] which serves as the denominator. The numerator is basically the value of the assets securing the Notes, and the denominator is the aggregate principal balance on the Notes through the class being tested. The resulting percentage quantifies the leverage of the Concord CDO through the tested class. If the percentage is equal to or greater than the compliance threshold, then the CDO passes the test. If not, the CDO fails the test.

If a Par Value Test is not met as of a given Measurement Date, then funds that otherwise would be used to pay interest on the class of Notes at the level where the test failed and on any junior securities are instead used to redeem the most senior class of Notes then outstanding. *See id.* §§ 9.6 & 11.1. Redemptions continue until either the relevant Par Value Test is met or until the senior Notes are fully redeemed. Redeeming the senior Notes should result eventually in the Par Value Test being met, because redeeming Notes decreases the denominator in the test. Assuming that the numerator remains constant, decreasing the denominator increases the resulting percentage. Assuming the value of the Collateral Interests is stable, reducing the Aggregate Outstanding Amount by redeeming senior Notes

---

**2.** The Indenture defines "Net Outstanding Portfolio Balance" as follows:

> On any Measurement Date, the sum (without duplication) of:
> (i) the Aggregate Principal Balance on such measurement Date of the Collateral Interests (other than Defaulted Interests);
> (ii) the Aggregate Principal Balance of all Principal Proceeds held as Cash and Eligible Investments, all Cash and Eligible Investments held in the Unused Proceeds Account that have not been designated as Interest Proceeds by the Collateral Manager with respect to the Effective Date and all Cash and Eligible Investments held in the Future Funding Obligations Account; and

> (iii) with respect to each Defaulted Interest, the Calculation Amount of such Defaulted Interest.

IA § 1.1 at 56.

**3.** The Indenture defines "Aggregate Outstanding Amount" as follows:

> With respect to any Class or Classes of Notes the aggregate principal balance (excluding any Class D Deferred Interest, Class E Deferred Interest, Class F Deferred Interest, Class G Deferred Interest and Class H Deferred Interest, as the case may be) of such Class or Classes Outstanding at the date of determination.

IA § 1.1 at 4–5.

should bring the Concord CDO back into compliance.

## C. Concord Sponsor Anticipates A Par Value Test Failure.

In December 2009, Concord Sponsor became concerned that the Concord CDO might fail one or more levels of the Par Value Test because of a decline in the market value of the Collateral Interests. Through Concord Trust, Concord Sponsor approached the Trustee about canceling certain Notes. The Trustee took the position that Notes could not be canceled voluntarily under the terms of the Indenture.

On January 5, 2010, Concord Trust delivered a letter to the Issuer and Co–Issuer renouncing all of its rights, title, and interest in the following Notes and surrendering them free of charge:

(i) $10.925 million Class C Notes (CUSIP 20647MAD0);

(ii) $11.2 million Class D Notes (CUSIP 20647MAE8);

(iii) $5 million Class E Notes (CUSIP 20647MAF5);

(iv) $2 million Class F Notes (CUSIP 20647MAG3);

(iv) $18.6 million Class G Notes (CUSIP 9ABS88456);

(v) $18.6 million Class H Notes (CUSIP 9ABS88431).

The parties refer to these Notes as the "Subject Notes." On the same date, the Issuer and Co–Issuer delivered the Subject Notes for cancellation to the Trustee in its capacity as Notes Registrar and directed that the Notes be canceled. The Trustee declined to cancel the Subject Notes.

The fate of the Subject Notes determines the outcome of the Par Value Tests at the Class E, F, and G levels for the Measurement Date that occurred on February 19, 2010. If the Subject Notes were "Outstanding," then the Par Value Ratios fell below their respective thresholds, as shown by the following table:

| Testing Class | Aggregate Outstanding Amount | Net Outstanding Portfolio Balance | Par Value Ratio | Threshold | Pass/Fail |
|---|---|---|---|---|---|
| Class ABC | $292,950,000.00 | $428,817,407.20 | 146.38% | 135% | Pass |
| Class D | $330,150,000.00 | $428,817,407.20 | 129.89% | 126% | Pass |
| Class E | $352,237,000.00 | $428,817,407.20 | 121.74% | 122% | Fail |
| Class F | $376,650,000.00 | $428,817,407.20 | 113.85% | 118% | Fail |
| Class G | $395,250,000.00 | $428,817,407.20 | 108.49% | 113% | Fail |

If the Subject Notes were no longer "Outstanding," then each Par Value Test was met, as shown by the following table:

| Testing Class | Aggregate Outstanding Amount | Net Outstanding Portfolio Balance | Par Value Ratio | Threshold | Pass/Fail |
|---|---|---|---|---|---|
| Class ABC | $282,025,000.00 | $428,817,407.20 | 152.05% | 135% | Pass |
| Class D | $308,025,000.00 | $428,817,407.20 | 139.22% | 126% | Pass |
| Class E | $325,112,000.00 | $428,817,407.20 | 131.90% | 122% | Pass |
| Class F | $347,525,000.00 | $428,817,407.20 | 123.39% | 118% | Pass |

| Class G | $347,525,000.00 | $428,817,407.20 | 123.39% | 113% | Pass |

When a Par Value Tests fails, then funds must be diverted to redeem the senior Notes. The following chart compares the allocation of cash flows if the Subject Notes were not canceled with the allocation of cash flows if the Subject Notes were canceled:

| Security | Payments (Without Cancellation) | Payments (With Cancellation) |
|---|---|---|
| A-1 | $88,942.17 | $88,942.17 |
| | $922,135.82 in redemptions | |
| A-2 | $11,424.49 | $11,424.49 |
| B | $25,651.89 | $25,651.89 |
| C | $12,264.10 | $5,860.98 |
| D | $31,412.85 | $21,955.22 |
| E | $27,209.67 | $21,050.01 |
| F | 0 | $38,226.32 |
| G | 0 | 0 |
| H | 0 | 0 |
| Preferred | 0 | $548,110.93 |

Thus, if the Subject Notes remain outstanding, then the Class A-1 Noteholders are entitled to have $922,135.82 of the principal amount of their Notes redeemed. If the Subject Notes are canceled, then no redemption payment is due, the Class F Notes receive $38,226.32 in interest, and the Preferred Shares receive $548,110.93 in distributions. In addition, if the Subject Notes are canceled, then the Issuer and Co–Issuer can reinvest an additional $406,710.55 of proceeds in the Concord CDO.

## II. LEGAL ANALYSIS

■ Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and it is "entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The Indenture is governed by New York law. IA § 14.9; *see Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1120 (Del. Ch.2008) (applying New York choice of law provision in indenture agreement). Under New York law, "[t]he construction and interpretation of an unambiguous written contract is an issue of law within the province of the court." *Estate of Hatch v. NYCO Minerals Inc.*, 245 A.D.2d 746, 666 N.Y.S.2d 296, 298 (1997). Summary judgment therefore provides an optimal procedural mechanism for construing an unambiguous contract governed by New York law. *Law Debenture Trust Co. of N.Y. v. Petrohawk Energy Corp.*, 2007 WL 2248150, at *5 (Del. Ch. Aug. 1, 2007) (citing *Marinas of the Future, Inc. v. City of New York*, 87 A.D.2d 270, 450 N.Y.S.2d 839, 843–44 (1982)).

■ Under New York law, words of a contract are enforced in accordance with their plain meaning. *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 450 N.Y.S.2d 460, 435 N.E.2d 1075, 1078 (1982). Individual words and provisions should not be read in isolation, but rather in light of the "plain purpose and object" of the agreement. *Kass v. Kass*, 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174, 181 (1998).

A contract should be read as a whole. *Niagara Frontier Transp. Auth. v. Euro–United Corp.*, 303 A.D.2d 920, 757 N.Y.S.2d 174, 176 (2003).

Courts strive to give indenture provisions a consistent and uniform meaning because "[u]niformity in interpretation is important to the efficiency of capital markets." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir.1982) (Winter, J.). "Whereas participants in the capital market[s] can adjust their affairs according to a uniform interpretation, ... the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets." *Id.*; *accord Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398–99 (Del.1996) (discussing importance of certainty in interpretation to standard provisions used in capital market transactions); *San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304, 314 (Del.Ch. 2009) (same), *aff'd*, 981 A.2d 1173 (Del. 2009) (TABLE).

Courts enhance stability and uniformity of interpretation by looking to the multi-decade efforts of leading practitioners to develop model indenture provisions. *E.g.*, *Sharon Steel Corp.*, 691 F.2d at 1048–50; *Kaiser Aluminum Corp.*, 681 A.2d at 396–97. The process began in 1960 with the Corporate Indenture Project, an initiative of the Committee on Developments in Business Financing of the American Bar Association's Section on Business Law. *See* Churchill Rodgers, *The Corporate Trust Indenture Project*, 20 Bus. Law 551 (1965). The Model Debenture Indenture Provisions were completed in 1965, followed by the Model Debenture Indenture Provisions—All Registered Issue in 1967. In 1971, the American Bar Foundation published a volume entitled *Commentaries on Indentures* (hereinafter, the "Commentaries"). The Commentaries contain both model sets of provisions and offer section-by-section analysis. In 1983, a working group of the Committee on Developments in Business Finance published the *Model Simplified Indenture*, 38 Bus. Law. 741 (1983). In 2000, the Committee on Business Finance collaborated with the Committee on Trust Indenture and Indenture Trustees of the ABA Section of Business Law (formed in the mid–1990s) to publish the *Revised Model Simplified Indenture*, 55 Bus. Law. 1115 (2000). The latter two models were "simplified" in that they focused on the structural and boilerplate provisions that typically are not negotiated, while omitting the financial covenants that are heavily negotiated and tailored to a specific issuer and transaction. The Committee on Trust Indentures and Indenture Trustees has since published the *Model Negotiated Covenants and Related Definitions*, 61 Bus. Law. 1439 (2006), which provides model provisions for non-boilerplate, negotiated sections. While these materials obviously are no substitute for construing the agreement, they provide powerful evidence of the established commercial expectations of practitioners and market participants.

## A. The Common Law Rule That Governs Absent A Controlling Provision In The Indenture

█ The Indenture does not explicitly address the surrender of Notes for no consideration with an instruction that they be canceled. No provision expressly allows it. No provision expressly prohibits it. Unable to cite a provision directly on point, the parties have joined issue over two boilerplate provisions that speak indirectly to cancellation in general. I therefore first determine the common law rule that will apply to the surrender of the Subject Notes absent a governing contrac-

tual provision. I look to the common law because this body of jurisprudence provides a backdrop of standard default rules that supplement negotiated agreements and fill gaps when a contract is incomplete, whether by inadvertence or design. Parties can contract around virtually all common law rules. In a lengthy and sophisticated agreement like the Indenture, the terms of the agreement and not the common law will control many issues. But unless contradicted or altered by the parties' agreement, the common law rules form an implied part of every contract.[4]

For over a century, New York courts have held that the delivery of a promissory note to the obligor with the intent to cancel the note discharges the obligation and cancels the debt.

> The rule seems to be well settled by the authorities that where an obligee delivers up the obligation which he holds against another party, with the intent and for the purpose of discharging the debt, where there is no fraud or mistake alleged or proven, that such surrender operates in law as a release and discharge of the liability thereon; nor is any consideration required to support such a transaction when it has been fully executed.

*Larkin v. Hardenbrook,* 90 N.Y. 333, 334 (1882); *accord Gerard v. Bank of N.Y. & Trust Co.,* 265 N.Y. 336, 193 N.E. 165, 167 (1934); *Edwards v. Campbell,* 23 Barb. 423, 423 (N.Y. Gen.Term 1856). I refer to this rule as the "Delivery Rule."

The Delivery Rule comports with black-letter authority. "Delivery of a bond, with the intention and direction that it be canceled, to the obligor ... extinguishes the bond." 11 C.J.S. Bonds § 63. "An obligee's cancellation, destruction or surrender to the obligor of a writing of a type customarily accepted as a symbol or as evidence of his right discharges without consideration the obligor's duty if it is done with the manifested intention to discharge it." Restatement (Second) of Contracts § 274.

For negotiable instruments, New York codified the Delivery Rule through the adoption of Article 3 of the New York Uniform Commercial Code. Section 3–605 provides that "[t]he holder of an instrument may even without consideration discharge any party ... (b) by renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged." N.Y. U.C.C. § 3–605; *see generally* 4 William D. Hawkland & Lary Lawrence, *Uniform Commercial Code Series* § 3–605(1) (Frederick H. Miller ed., 2009) (describing ability of holder to renounce rights in a negotiable instrument through a writing signed and delivered or by surrendering the instrument to the party to be discharged). The predecessor statute, Section 203 of the Negotiable Instruments Law, likewise codified the Delivery Rule. *See, e.g., Bank of U.S. v.*

---

**4.** Restatement (Second) of Contracts § 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *see, e.g., Haines v. City of New York,* 41 N.Y.2d 769, 396 N.Y.S.2d 155, 364 N.E.2d 820, 822–823 (1977) (following Restatement rule and supplying omitted common law term); *Metro–Goldwyn–Mayer, Inc. v. Scheider,* 40 N.Y.2d 1069, 392 N.Y.S.2d 252, 360 N.E.2d 930, 931 (1976) (same); *see generally* 28 Glen Banks, *New York Contract Law* § 11:9 (2006 & Supp. 2010) (discussing implied common law terms); Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules,* 99 Yale L.J. 87, 88–91 (1989); Charles J. Goetz & Robert E. Scott, *The Mitigation Principle: Toward a General Theory of Contractual Obligation,* 69 Va. L.Rev. 967, 971 (1983).

*Manheim,* 264 N.Y. 45, 189 N.E. 776, 776–77 (1934) (quoting and applying Section 203 of the Negotiable Instruments Law).[5]

▮ The Delivery Rule reflects and is consistent with basic notions of property rights. The Subject Notes are a form of intangible personal property. *See Nuevo El Barrio Rehabilitacion de Vivienda Y Economia, Inc. v. Moreight Realty Corp.,* 2009 WL 5895336, at *5 (N.Y.Sup.Ct. Nov. 16, 2009) (describing "property such as bonds, stocks or certificates of deposit" as intangible personal property); *Health Servs. Med. Corp. of Cent. N.Y., Inc. v. Chassin,* 175 Misc.2d 621, 668 N.Y.S.2d 1006, 1012 (N.Y.Sup.Ct.1998) ("Personal property is generally defined to include money, notes, bonds, stocks and other intangibles."), *aff'd,* 259 A.D.2d 1053, 689 N.Y.S.2d 875 (1999). Unless otherwise proscribed by agreement, common law, or statute, the owner of a property right can alienate it as he sees fit. *See Mann v. Schuman,* 1 A.D.2d 678, 146 N.Y.S.2d 716, 717 (1955) (describing alienability of stock and explaining that absent a valid restriction, "ownership of property carries with it as an incident of the estate the right to sell the property at any time"). The holder of a contract right can choose to waive it. *See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 817 N.Y.S.2d 606, 850 N.E.2d 653, 658 (2006) ("Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned.") (citations omitted); *Rosengardt v. Muhlfelder Co.,* 12 Misc.2d 142, 177 N.Y.S.2d 215, 216

(N.Y.Sup.Ct.1958) ("[Waiver] is the voluntary act of the party, and does not require or depend upon a new contract, new consideration, or an estoppel." (internal quotation and citations omitted)). The Delivery Rule recognizes the right of the holder of the contractual obligation to control the disposition of his property.

I conclude that absent a contrary provision in the Indenture, Concord Trust had the right to surrender the Subject Notes to the Issuer and Co–Issuer with the intent and for the purpose of discharging the contractual obligations the Subject Notes represented, and that this act operated as a release and discharge of the Subject Notes. Absent a contrary provision in the Indenture, the Subject Notes were discharged as of January 5, 2010, the date on which Concord Trust surrendered them to the Issuer and Co-Issuer.

### B. The Specific Provisions Of The Indenture

As noted, the Indenture does not specifically contract around the Delivery Rule. Implicitly recognizing the absence of any provision directly on point, the parties have joined issue over two boilerplate provisions that address cancellation generally: (i) Section 2.9, entitled "Cancellation," and (ii) the definition of "Outstanding," which drives the calculation of the Aggregate Outstanding Amount for purposes of the denominator in the Par Value Test. IA § 2.9 & § 1.1 at 58. Neither provision alters the Delivery Rule.

---

**5.** I recognize that the Subject Notes are not governed by Article 3. *See* N.Y. U.C.C. § 3–103 ("This article does not apply to money, documents of title or investment securities."); *id.* § 8–103(d) ("A writing that is a security certificate is governed by this Article [8] and not by Article 3, even though it also meets the requirements of that Article."); *Vigilant Ins. Co. of Am. v. Housing Auth. of El Paso,* 87

N.Y.2d 36, 42–43, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995) (holding Article 3 inapplicable to bearer bonds). I cite Section 3–605 and the superseded section of the Negotiable Instruments Law because they demonstrate New York's commitment to the Delivery Rule as an appropriate default rule, not because they are controlling.

Because the essence of their dispute is whether the Subject Notes should have been canceled, the parties have focused primarily on Section 2.9. This provision states:

> All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, and shall be promptly canceled by the Trustee and may not be reissued or resold. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.9, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer and the Co-Issuer shall direct by an Issuer Order that they be returned to them.

*Id.* § 2.9. Citing the familiar maxim of *inclusio unius est exclusio alterius,* the Trustee argues that Section 2.9 identifies the exclusive instances in which Notes can be canceled and that only the Trustee can cancel Notes.

 Although I agree with the Trustee that Section 2.9 identifies situations in which the Trustee must cancel Notes, I disagree that Section 2.9 eliminates the Delivery Rule. The venerable principle that the Trustee cites can be a helpful interpretive aid, but "[t]his maxim is not a rule of law" and is "not always dispositive." C.J.S. Contracts § 327. The canon "need not be mechanically applied." *United States v. Local 6A, Cement & Concrete Workers, Laborers Int'l Union of N. Am.,* 832 F.Supp. 674, 679 (S.D.N.Y.1993). Here, the plain language of Section 2.9 and the history of the cancellation provision point to a different conclusion.

As a threshold matter, the language of Section 2.9 does not attempt to define the term "cancellation." The Indenture never defines the term—a noteworthy omission in a document whose section on definitions spans 78 pages. Although the title of Section 2.9 is "Cancellation," the Indenture expressly instructs a reviewing court not to rely on headings when construing the agreement. IA § 14.5 ("The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof."). Neither Section 2.9 nor any other provision of the Indenture contains any contractual language that would narrow or otherwise alter the plain meaning of "cancellation" as including the Delivery Rule.

Section 2.9 also is not framed as an exclusive provision. If Section 2.9 were intended to identify the only situations under which Notes could be canceled, it easily could say so directly. An obvious example of operative language might be: "Notes shall be canceled in the following circumstances...." Section 2.9 instead is drafted conditionally. Structurally it states that *if* Notes are surrendered for reasons X, Y, or Z, *then* those Notes "shall be promptly canceled by the Trustee...." *Id.* § 2.9. The provision does not address what might happen in other situations.

The language of the Indenture as a whole suggests a contractual rationale for identifying some specific situations in Section 2.9. Although the list is awkwardly worded, Section 2.9 identifies four situations: "Notes [1] surrendered for payment, [2] registration of transfer, exchange or [3] redemption, or [4] deemed lost or stolen." *Id.* In each of these situations, the Indenture contemplates a specific role for the Trustee.

When Notes are "surrendered for payment," the Indenture provides that "the Holder thereof shall present and surren-

der such Note at the Corporate Trust Office of the Trustee or at the office of the Paying Agent ... on or prior to such Maturity." *Id.* § 2.7(n). Payments are made by the Trustee out of the "Payment Account," a "single, segregated trust account" under the control of the Trustee. *Id.* § 10.3. Surrender of Notes "for payment" and their subsequent cancellation thus requires the involvement of the Trustee. Although the mechanisms are more complex, the redemption process contemplates similar roles for the Trustee. *See id.*, Art. 9 ("Redemption of Securities; Redemption Procedures"). The transfer or exchange of Notes and the submission of Notes "deemed lost or stolen" likewise involve the Trustee. In each case, the Trustee "shall authenticate and deliver" one or more new Notes. *See id.* § 2.5(a) (issuance of a Note in the name of the transferee); *id.* (issuance of one or more new Notes in different denominations or principal amounts in exchange for the surrendered Note); *id.* § 2.6 (issuance of replacement Note). The plain language of Section 2.9 logically grants the Trustee authority over cancellation in situations where the Indenture has a substantive role in the underlying process. Section 2.9 does not contract around the Delivery Rule.

My interpretation of the plain language of Section 2.9 finds support in the Commentaries, the Model Simplified Indenture, and the Revised Model Simplified Indentures. The language of Section 2.9 has direct antecedents in the model provisions found in these documents. The model provision from the Commentaries states:

All Debentures [6] and coupons surrendered for payment, conversion or re-

demption shall, if surrendered to the Company or any agent of the Company, be delivered to the Trustee and, if not already cancelled, shall be promptly cancelled by it. *The Company may at any time deliver to the Trustee for cancellation any Debentures previously authenticated and delivered hereunder, together with all unpaid coupons appertaining thereto, which the Company may have acquired in any manner whatsoever, and all Debentures so delivered shall be promptly cancelled by the Trustee.* No Debentures shall be authenticated in lieu of or in exchange for any Debentures cancelled as provided in this Section, except as expressly permitted by this Indenture. All cancelled Debentures and coupons held by the Trustee shall be disposed of as directed by a Company Order.

Commentaries at 191–92 (emphasis added).

The model provision in the Commentaries thus expressly states that "[t]he Company may at any time deliver to the Trustee for cancellation any Debentures ... which the Company may have acquired in any manner whatsoever, and all Debentures so delivered shall be promptly cancelled by the Trustee." *Id.* at 191. The Commentaries explain that this language "specifically authorizes the Company to deliver to the Trustee for cancellation, debentures acquired by the Company." *Id.* at 192. The analysis continues:

Typically, these would be treasury debentures acquired by purchase on the market that the Company desires to render no longer outstanding. *One might think that the Company's right to effect such cancellation would be implicit,* but instances are known where the

---

**6.** The Commentaries' use of the term "debentures" rather than "notes" is not significant. There is no inherent or legally recognized distinction among the terms "debentures,"

"bonds," or "notes" in American law. William W. Bratton, *Corporate Finance* 240 (6th ed. 2008).

propriety of such cancellation, in the absence of an express provision, was questioned.

*Id.* (emphasis added). The Commentaries thus view the explicit language addressing cancellation as confirming a right the issuer ordinarily would have. Although the Commentaries do not cite authorities, this appears to refer to the Delivery Rule.

Subsequent efforts at model provisions have continued this approach. The Model Simplified Indenture preserves the concept of issuer delivery for cancellation, although it tweaks the language a bit. Its cancellation provision states:

> *The Company may at any time deliver Securities to the Trustee for cancellation.* The Registrar, Paying Agent, and Conversion Agent shall forward to the Trustee any Securities surrendered to them for registration of transfer, exchange, payment or conversion. The Trustee shall cancel all Securities surrendered for registration of transfer, exchange, payment, conversion or cancellation and shall dispose of canceled Securities as the Company directs. The Company may not issue new Securities to replace Securities that it has paid or delivered to the Trustee for cancellation or that any Securityholder has converted pursuant to Article 10.

38 Bus. Law. at 753 (emphasis added). The comment to this provision addresses only the destruction or disposition of canceled securities, which it states should be "the subject of a standing instruction from the Company to the Trustee." *Id.* at 787.

The Model Revised Simplified Indenture again preserves the concept of issuer delivery for cancellation, albeit with some additional tweaks. Its provision states:

> *The Company at any time may deliver Securities to the Trustee for cancellation.* The Paying Agent and Conversion Agent, if not the Trustee, shall forward to the Trustee any Securities surrendered to them for payment or conversion. The Trustee shall cancel all Securities surrendered for registration of transfer, exchange, payment, conversion or cancellation and shall dispose of canceled Securities according to its standard procedures or as the Company otherwise directs. The Company may not issue new Securities to replace Securities that it has paid or which have been delivered to the Trustee for cancellation or that any Securityholder has converted.

55 Bus. Law. at 1130 (emphasis added). The comment observes that it is "largely unchanged" from the Model Simplified Indenture. *Id.* at 1181.

Unlike the model provisions, Section 2.9 does not contain the language about an issuer's right to tender securities for cancellation. Because the history of the model provision shows that language was intended to confirm the common law right, the omission of the language from Section 2.9 does not alter the Delivery Rule.

The parties next focus on the definition of "Outstanding." The Indenture defines the term as follows:

> "Outstanding": With respect to the Notes, as of any date of determination, all of the Notes or any Class of Notes, as the case may be, theretofore authenticated and delivered under this Indenture except:
>
> (i) *Notes theretofore canceled by the Notes Registrar or delivered to the Notes Registrar for cancellation*;
>
> (ii) Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or the Paying Agent in trust for the Holders of such Notes pursuant to Section 4.1(a)(ii); ...

(iii) Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course; and

(iv) Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.6 hereof;

[provided] that in determining whether the Noteholders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (x) Notes owned by the Issuer, the Co–Issuer or any Affiliate thereof shall be disregarded and deemed not to be outstanding....

IA § 1.1 at 58–59 (emphasis added). The parties debate subpart (i) of the definition, which refers to the cancellation of Notes by the Notes Registrar rather than the Trustee and argue over whether it conflicts with Section 2.9.

I conclude that subpart (i) of the definition of Outstanding and its reference to the Notes Registrar are consistent with the Delivery Rule. Section 2.5 of the Indenture makes clear that the Notes Registrar performs one of the administrative functions typically performed by a transfer agent: maintaining records identifying the owners of the Notes.[7] Section 2.5(a) provides:

The Issuer and Co-Issuer shall cause to be kept a register (the "Notes Register") in which, subject to such reasonable regulations as they may prescribe, the Issuer and the Co–Issuer shall provide for the registration of Notes and the registration of transfers of Notes. The Trustee is hereby initially appointed "Notes Registrar" for the purpose of registering Notes and transfers of such Notes with respect to the Notes Register and holding the Notes Register. Upon any resignation or removal of the Notes Registrar, the Issuer and the Co-Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Notes Registrar.

*Id.* § 2.5(a) (emphasis added). Under Section 2.8, the Issuer, Co–Issuer, Trustee, and any of their agents "may treat as the owner of a Note the Person in whose name such Note is registered on the Notes Register...." *Id.* § 2.8. The Trustee currently serves as Notes Registrar.

The Notes Registrar thus takes care of the back-office function of maintaining the Notes Register. When Notes are canceled, the Notes Registrar records that fact on the Notes Register. *Id.* § 2.5(a). Because the Notes Registrar keeps the Notes Register, the term Outstanding is logically defined to exclude "Notes theretofore canceled by the Notes Registrar or delivered to the Notes Registrar for cancellation." *Id.* § 1.1 at 58. This definition recognizes that the Notes Registrar maintains the official ownership records of the Issuer and Co–Issuer, *viz.* the Notes Register, and thus it is the Notes Registrar's records that are used to determine what Notes are Outstanding.

---

7. Under the Indenture, the Issuer and Co–Issuer also designate a Transfer Agent, defined as "[t]he Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Note." IA § 1.1 at 77. The Notes Registrar thus technically maintains the Notes Register but does effect transfers or exchanges. The logic of balkanizing these functions escapes me, particularly when the Indenture appoints the Trustee as both the Notes Registrar and Transfer Agent. The nominal division of labor does suggest the limited and ministerial nature of the Notes Registrar's role.

I do not construe the definition of Outstanding as giving substantive authority to the Notes Registrar to determine whether or not to cancel Notes. The Indenture assigns ultimate responsibility for the Notes Register to the Issuer and Co-Issuer. *Id.* § 2.5(a) ("The Issuer and Co-Issuer shall cause to be kept a register . . . ."). Unless they use an administrative agent like the Notes Registrar, the Issuer and Co-Issuer must keep track of the Notes themselves. *Id.* § 2.5(a) ("[T]he Issuer and Co-Issuer shall . . ., in the absence of such appointment [of a Notes Registrar], assume the duties of Notes Registrar."). The Indenture recognizes that the Issuer and Co-Issuer can remove and replace the Notes Registrar, and Section 2.5(a) requires that the Issuer and Co-Issuer prescribe regulations for the Notes Registrar to carry out its duties. *Id.* The Notes Registrar acts as an agent for the Issuer and Co-Issuer. *Id.* § 2.5(a); *see also* Bratton, *supra,* at 241 ("The issuer, or its *agent* (usually the indenture trustee), keeps a registry of the owners of the issue, and remits payments of interest, prepayments of principal, and principal payments to the registered owner.") (emphasis added).

■ Given this agency relationship, authority over the recording of ownership, including cancellation, rests with the Issuer and Co-Issuer. "The basic tenet of a principal-agent relationship is that the principal retains control over the conduct of the agent with respect to matters entrusted to the agent, and the agent acts in accordance with the direction and control of the principal." *William Stevens, Ltd. v. Kings Vill. Corp.,* 234 A.D.2d 287, 650 N.Y.S.2d 307, 308 (N.Y.App.Div.1996). "As long as such directions are not unreasonable, the agent is bound to obey them, even if it appears that some other course of conduct was better than that which the [principal] chose." *Id.*

Except in situations when Section 2.9 assigns the Trustee a role in the cancellation process, the Trustee has no authority over cancellation. When the Trustee acts as Notes Registrar, it performs that function as agent of the Issuer and Co-Issuer. Notably, if the Issuer and Co-Issuer remove and replace the Trustee as Notes Registrar, then the Trustee no longer bears any responsibility for maintaining the Notes Register or for verifying the ownership of Notes. Section 2.5(a) recognizes this fact. It provides that in such a case, the Trustee has the right to inspect the Notes Register and to rely on a certificate executed by an officer of the Notes Registrar as to the ownership of Notes. IA § 2.5(a).

I conclude that under the Indenture, the Issuer and Co-Issuer are responsible for maintaining the Notes Register. The Issuer and Co-Issuer therefore can instruct the Notes Registrar regarding the recordation of securities, including the cancellation of Notes. Except in situations where Section 2.9 of the Indenture empowers the Trustee to cancel Notes, the Issuer and Co-Issuer retain the authority to cancel Notes and to instruct the Notes Registrar to effect cancellation.[8]

8. I would reach the same conclusion if subpart (i) of the definition of Outstanding employed the language found in the model definition in the Commentaries, which states: " 'Outstanding' when used with respect to Debentures means, as of the date of determination, all Debentures theretofore authenticated and delivered under this Indenture except: (i) Debentures theretofore cancelled and delivered to the Trustee for cancellation . . . ." *Commentaries* at 41. This definition envisions the Trustee performing the same administrative role as the Notes Registrar. The reference to the Trustee is not sufficient to trump the Delivery Rule. Parties who wish to

In the context of this case, the Issuer and Co–Issuer properly instructed the Notes Registrar to cancel the Subject Notes. The Notes Registrar, as the agent of the Issuer and Co–Issuer, was obligated to carry out this instruction. Section 2.9 does not provide the Trustee *qua* Trustee with any role in the situation presented by this case. Acting in its capacity as Notes Registrar, the Trustee was obligated to cancel the Subject Notes when instructed to do so by the Issuer and Co–Issuer. Under the plain meaning of the definition of Outstanding, the Subject Notes were no longer Outstanding from the time they were "delivered to the Notes Registrar for cancellation," which was January 5, 2010.

## C. The Delivery Rule Is Consistent With The Reasonable Contractual Expectations Of The Senior Noteholders.

 The Trustee argues that permitting the Subject Notes to be canceled would defeat the reasonable contractual expectations of the senior Noteholders by depriving them of the redemption payments they would receive if the Coverage Test failed. Under the Indenture, the Noteholders bargained for the return of their principal plus interest at the agreed-upon rate. Each Noteholder has a reasonable contractual expectation of receiving timely and periodic payments of principal and interest through the maturity of the Notes in December 2046.

In addition to this core entitlement, the Noteholders bargained for protections for their investment, including the right to redemption payments if a Coverage Test fails. The redemption payments are conditioned on the failure of a Coverage Test. The Noteholders did not bargain for a contractual right to hold the pool of Collateral Interests constant such that a Coverage Test must fail. The Noteholders also did not bargain for a covenant that would limit the ability of the Issuer or Co-Issuer to take actions designed to ensure that the Coverage Tests are met. The Indenture does not contain any covenant prohibiting the Issuer or Co-Issuer from taking actions that might affect the Coverage Tests.

 "Issuers of corporate debt do not breach their contractual obligations by structuring transactions to avoid triggering a mandatory redemption provision in favor of Noteholders." *Law Debenture Trust*, 2007 WL 2248150, at *7 (applying New York law). The Noteholders purchased securities that carry protections in the form of a mandatory redemption provision triggered by the failure of a Coverage Test. As long as the Coverage Tests are met on each respective Measurement Date and timely payments of principal and interest are made, then the Noteholders' contractual expectations are being met. Provided that they do not run afoul of any other provision of the Indenture, the Issuer and Co-Issuer do not breach their contractual obligations by taking actions to remain in compliance with the Coverage Tests and avoid the mandatory redemption obligation. Permitting the cancellation of the Subject Notes in accordance with the Delivery Rule is thus consistent with and does not defeat the contractual expectations of the senior Noteholders.

## III. CONCLUSION

For the foregoing reasons, I grant the Issuer and Co-Issuer's motion for summary judgment and deny the Trustee's motion for summary judgment. The Subject Notes were validly delivered for cancellation to the Notes Registrar as of January 5, 2010, and were no longer Out-

make securities non-cancellable should provide specifically for this result.

standing as of that date. **IT IS SO OR-
DERED.**