**In re BANKATLANTIC BANCORP, INC. LITIGATION.**

**C.A. No. 7068–VCL.**

Supreme Court of Delaware.

Submitted: Feb. 15, 2012.

Decided: Feb. 27, 2012.

Kenneth J. Nachbar, Megan Ward Cascio, Shannon E. German, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Jonathan E. Pickhardt, Richard I. Werder, Jr., Rex Lee, Ali M. Arain, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York; Attorneys for Plaintiffs Hildene Capital Management, LLC, Hildene Opportunities Master Fund, Ltd., Brett Jefferson, Alesco Preferred Funding IV, Ltd., Alesco Preferred Funding XVI, Ltd., Alesco Preferred Funding XVII, Ltd., Trapeza CDO I, LLC, Trapeza CDO II, LLC, and Trapeza CDO III, LLC.

Gary F. Traynor, Bruce E. Jameson, J. Clayton Athey, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Mark J. Hyland, Jeffrey M. Dine, Benay L. Josselson, Seward & Kissel LLP, New York, New York; Attorneys for Plaintiff Wells Fargo Bank, N.A. in its Capacity as Institutional Trustee for BBC Capital Trust IX and BBC Capital Trust XII.

Barry M. Klayman, Cozen O'Connor, Wilmington, Delaware; Andrew I. Silfen, Arent Fox LLP, New York, New York; Timothy F. Brown, Jeffrey N. Rothleder, Jackson D. Toof, Arent Fox LLP, Washington, D.C.; Attorneys for Plaintiff Wilmington Trust Company in its Capacity as Indenture Trustee for BBC Capital Trust II, BBC Capital Trust XI, and BBX Capital Trust 2007 II(a).

Collins J. Seitz, Jr., Garrett B. Moritz, S. Michael Sirkin, Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; Eugene E. Stearns, Adam M. Schachter, Cecilia Duran Simmons, Gordon M. Mead, Jr., Geri F. Satin, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, Florida; Attorneys for Defendant BankAtlantic Bancorp, Inc.

LASTER, Vice Chancellor.

Defendant BankAtlantic Bancorp, Inc. ("Bancorp") is a bank holding company. Bancorp holds 100% of the equity of BankAtlantic, a federal savings bank, which is Bancorp's only substantial asset. Bancorp has agreed to sell BankAtlantic to BB & T Corporation. As consideration, Bancorp will receive 100% of the equity of a newly formed entity that will own BankAtlantic's "criticized assets," such as non-performing loans and foreclosed real estate. After the transaction, Bancorp no longer will own a bank and no longer will be a federally regulated bank holding company. By the most conservative measure, Bancorp will convey 85–90% of its assets, and the transaction will change fundamentally the nature of Bancorp's business.

The plaintiffs sued to enforce debt covenants that prohibit Bancorp from selling "all or substantially all" of its assets unless the acquirer assumes the debt. The evidence at trial established that Bancorp is selling substantially all of its assets, and

BB & T has not agreed to assume the debt. The ensuing event of default will result in the debt accelerating. Bancorp cannot pay the accelerated debt. Because this eventuality will inflict irreparable harm on the plaintiffs, I have entered contemporaneously an order permanently enjoining Bancorp from consummating the sale.

## I. FACTUAL BACKGROUND

Trial was held on January 26, 27, and 30, 2012. My factual findings follow.

### A. Bancorp And Its TruPS

Bancorp is a Florida corporation headquartered in Fort Lauderdale. It was formed in 1994 to serve as a holding company for BankAtlantic, which has existed since 1952. BankAtlantic is a traditional commercial bank that accepts deposits and makes loans.

Bancorp's stock trades publicly on the New York Stock Exchange under the symbol "BBX." Bancorp's Chairman and CEO, Alan Levan, and its Vice Chairman, John Abdo, own a majority of the voting shares of Bancorp's controlling stockholder, BFC Corporation ("BFC"). Levan's son, Jarett Levan, serves as President of Bancorp and CEO of BankAtlantic.[1] Valerie Toalson serves as CFO for both Bancorp and BankAtlantic.

Between 2002 and 2007, Bancorp raised approximately $285 million using a structured finance product known as trust preferred securities ("TruPS"). Many bank holding companies found TruPS attractive because they seemingly combined the best features of debt and equity: The bank holding company could deduct payments to investors as interest expense yet treat the security as equity capital under then-applicable banking regulations. To achieve this favorable duality, the bank holding company does not issue TruPS directly. Rather, it forms a wholly owned trust subsidiary that issues preferred equity securities— the TruPS—to investors. The trust subsidiary purchases as its sole asset junior subordinated notes issued by the bank holding company, and the terms of the TruPS mirror the terms of the junior subordinated notes. The bank holding company makes payments of principal and interest on the notes, and the trust uses the payments to redeem or pay dividends on the TruPS.

Bancorp followed this recipe. In 2002 and 2003, Bancorp issued eleven series of TruPS through trust subsidiaries denominated BBC Capital Trust II through XII.[2] In 2007, Bancorp issued two additional series of TruPS through trust subsidiaries denominated BBX Capital Trust 2007 I(a) and II(a). Each trust purchased an issuance of subordinated notes from Bancorp. Each trust sold TruPS to investors with terms in the declaration of trust that generally matched the terms of the indenture governing the subordinated notes. Each series of notes will mature thirty years after issuance, can be pre-paid approximately five years after issuance, and pays interest quarterly, although interest can be deferred for up to twenty consecutive quarters. The notes purchased by BBC Capital Trust II bear interest at a fixed annual rate of 8.5%, and its TruPS trade on Nasdaq. The notes purchased by the other trusts bear interest at a floating rate indexed to LIBOR. Their TruPS do not

---

1. Because Alan Levan plays the principal role in the case, I refer to him as "Levan." I distinguish the son by using his first name or noting the filial relationship.

2. The inaugural BBC Capital Trust I was formed and issued TruPS in 1997. Its TruPS were redeemed in 2002 with a portion of the proceeds from that year's TruPS issuances.

trade publicly, although there is a wafer-thin secondary market.

Each trust is overseen by an institutional trustee. Plaintiff Wilmington Trust Company is the trustee for and has sued on behalf of BBC Capital Trust II, BBC Capital Trust XI, and BBX Capital Trust 2007 II(a). Plaintiff Wells Fargo Bank, N.A., is the trustee for and has sued on behalf of BBC Capital Trust IX and BBC Capital Trust XII. The remaining plaintiffs hold TruPS issued by and have sued on behalf of BBC Capital Trust II, BBC Capital Trust V, BBC Capital Trust VI, BBC Capital Trust IX, BBC Capital Trust XII, and BBX Capital Trust 2007 I(a).[3] I refer to the wholly owned trust subsidiaries as the "Trusts." I refer to the notes they purchased as the "Debt Securities" and the indentures governing the Debt Securities as the "Indentures."

Technically, this decision only addresses the rights of the eight Trusts named in the case. For simplicity, I follow the parties' lead and take into account all of the outstanding Debt Securities when providing financial figures such as the amount of principal and interest due. To avoid burdening the reader with *seriatim* descriptions of eight substantively identical Indentures, I again follow the parties' lead and discuss a single representative Indenture. The pertinent provisions from all of the Indentures appear in Appendix A.

The Indenture for BBC Capital Trust IX, like all the Indentures, generally prohibits Bancorp from transferring all or substantially all of its assets. Section 3.07 provides that Bancorp

> will not, while any of the Debt Securities remain outstanding, . . . sell or convey all or substantially all of its property to any other Person unless the provisions of Article XI hereof are complied with.

JX 14 at 21. Section 11.01 qualifies the general prohibition as follows:

> Nothing contained in this Indenture or in the Debt Securities . . . shall prevent any sale, conveyance, transfer or other disposition of the property or capital stock of the Company or its successor or successors as an entirety, or substantially as an entirety, to any other Person (whether or not affiliated with the Company, or its successor or successors) authorized to acquire and operate the same; *provided, however,* that the Company hereby covenants and agrees that, upon any such . . . sale, conveyance, transfer or other disposition, the due and punctual payment of all payments due on all of the Debt Securities in accordance with their terms, according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this Indenture to be kept or performed by the Company, shall be expressly assumed by supplemental indenture reasonably satisfactory in form to the Trustee execut-

---

**3.** A subset of the non-trustee plaintiffs named as defendants BBC Capital Trust II, BBC Capital Trust IX, and BBC Capital Trust XII, and sought orders compelling the trustees of those Trusts to enforce the Indentures. Because Wilmington Trust and Wells Fargo have intervened as the trustees for those trusts and seek the same remedy as the non-trustee plaintiffs, any dispute over the non-trustee plaintiffs' standing to sue is moot. Another subset of the non-trustee plaintiffs sued to enforce the rights of BBX Capital Trust 2007 I(a) on the grounds that they own a majority of its TruPS and the trustee consented to the suit. A third subset of non-trustee plaintiffs sued to enforce the rights of BBC Capital Trust V and BBC Capital Trust VI on the grounds that they own 100% of the TruPS and the trustee failed to respond to their demand to sue. The defendants have not objected to the non-trustee plaintiffs suing on behalf of BBX Capital Trust 2007 I(a), BBC Capital Trust V, and BBC Capital Trust VI.

ed and delivered to the Trustee by ... the entity which shall have acquired such property or capital stock.

JX 14 at 48–49. I refer to the obligations imposed by Sections 3.07 and 11.01 as the "Successor Obligor Provision."

Failing to comply with the Successor Obligor Provision constitutes an "Event of Default" under the Indenture. Section 5.01 states:

> The following events shall be "Events of Default" with respect to Debt Securities:
>
> . . .
>
> (c) the Company defaults in the performance of, or breaches, any of its covenants or agreements in Sections 3.06, 3.07, 3.08 or 3.09 of this Indenture (other than a covenant or agreement a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 90 days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the holders of not less than 25% in aggregate principal amount of the outstanding Debt Securities, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder. . . .

JX 14 at 24–25.

The trustee has a range of remedies available following an Event of Default. Under Section 5.01, the trustee can accelerate the debt and declare that Bancorp's obligations are immediately due and payable:

> If an Event of Default occurs and is continuing with respect to the Debt Securities, then, and in each and every such case, ... either the Trustee or the holders of not less than 25% in aggregate principal amount of the Debt Securities then outstanding hereunder ... may declare the entire principal of the Debt Securities and the interest accrued, but unpaid, thereon, if any, to be due and payable immediately; and upon any such declaration the same shall become immediately due and payable.

JX 14 at 25. Wilmington Trust has represented that it will accelerate the debt if there is an Event of Default and believes that every trustee would do so.

In addition to acceleration, the trustee can seek legal and equitable remedies under Section 5.05 of the Indenture, including a decree of specific performance:

> In case of an Event of Default hereunder the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

JX 14 at 28. In this case, the plaintiffs seek either a decree of specific performance mandating that Bancorp comply with the Successor Obligor Provision or the functionally equivalent remedy of a permanent injunction against the sale of BankAtlantic to BB & T.

**B. Bancorp's Dependence On BankAtlantic**

In 2002 and 2003, when the bulk of the TruPS were issued, Bancorp described itself in its annual reports on Form 10–K as a "diversified financial services holding company." JX 2 at 2; JX 17 at 2. At the

time, in addition to BankAtlantic, Bancorp owned Levitt Corporation, a real estate company, and Ryan Beck & Co., Inc., an investment bank with approximately forty offices nationwide. Through these subsidiaries, Bancorp "provide[d] a full line of products and services encompassing consumer and commercial banking, real estate development, and brokerage and investment banking." JX 17 at 2. Bancorp spun off Levitt Corporation in 2003 and sold Ryan Beck & Co., Inc. to Stifel Financial Corporation in 2007.

Even when it held other businesses, Bancorp's financial health depended on BankAtlantic, its principal asset. In 2002, Bancorp disclosed that about 69% of its consolidated revenues came from BankAtlantic, which provided Bancorp's "principal source of liquidity." JX 17 at 57; JX 1 at S–4. Bancorp further explained that its ability to repay approximately $246.2 million in debt, the bulk comprising subordinated notes underlying the TruPS, was "largely dependent on BankAtlantic's ability to pay dividends" to Bancorp. JX 17 at 14.

From 2002 to 2007, Bancorp's corporate strategy revolved around growing BankAtlantic. In 2002, Bancorp sought to increase BankAtlantic's core deposits (generally demand deposit accounts, negotiable order of withdrawal (NOW) checking accounts, and savings accounts) by marketing BankAtlantic as "Florida's Most Convenient Bank." Bancorp spent upwards of $100 million on the campaign and created a highly valuable brand. BankAtlantic's core deposits increased from approximately $600 million at the end of 2001 to $2.8 billion at the end of 2010.

Since 2007, Bancorp has described itself in its public filings as a "unitary savings bank holding company" whose "principal asset" is its investment in BankAtlantic. JX 154 at 8. Bancorp currently has few assets and no meaningful operations other than BankAtlantic. Bancorp's only other business is a workout subsidiary formed in 2008 to move non-performing loans off BankAtlantic's balance sheet. As of December 31, 2010, BankAtlantic had 1,202 full-time employees; Bancorp employed eight. During the first nine months of 2011, BankAtlantic generated $110 million in interest income; Bancorp generated $196,000.

## C. Bancorp Suffers From The Downturn In The Florida Real Estate Market.

BankAtlantic's loan portfolio is concentrated in the Florida real estate market. Since 2007, BankAtlantic's results have suffered with that market. In 2008, 2009, and 2010, Bancorp reported losses of $202.6 million, $185.8 million, and $145.5 million, respectively. BankAtlantic has not paid dividends to Bancorp since 2008, and Bancorp does not expect to receive dividends in the foreseeable future. Over the same period, Bancorp's stock price declined from $142.42 at the beginning of 2007 to a low of $1.39 in March 2009. On October 31, 2011, the day before the sale to BB & T was announced, Bancorp's stock closed at $2.37.

In the first quarter of 2009, Bancorp began deferring interest payments on the Debt Securities, forcing the Trusts to defer dividend payments on the TruPS. As of December 31, 2010, Bancorp owed $322 million on the Debt Securities, including $28.2 million in deferred interest. Assuming flat interest rates and the continuing deferral of interest payments, Bancorp estimates that it will owe $367.8 million, including $74 million in deferred interest, by December 31, 2013. Bancorp would be obligated to bring the interest portion current in the first half of 2014.

## D. Bancorp Tries To Raise Capital.

In 2009, with losses mounting, Bancorp realized that it needed to raise capital. Management hired an investment bank and went on a road show to raise $75 million. No one was interested. Investors feared that Bancorp would not be able to put new money to work; instead it would hold the funds to meet capital requirements or use them to pay down debt.

After failing to find new investors, Bancorp turned to its existing stockholders. In September 2009, Bancorp sought $100 million in a rights offering but raised only $75 million. In July 2010, Bancorp sought another $25 million in a rights offering but raised only $20 million. In June 2011, Bancorp sought another $30 million in a rights offering but raised just $11 million.

## E. Bancorp Tries To Sell Its Tampa Branches And Deposits.

With its capital-raising strategy played out, Bancorp began selling assets. In 2010, BankAtlantic offered to sell its Tampa branches and approximately $350 million in deposits. Ten parties signed nondisclosure agreements, and four completed due diligence. Bancorp received two bids offering deposit premiums of 2% and 4%. Bancorp rejected the offers as inadequate.

The concept of a "deposit premium" reflects the unique role that deposits play in a bank. Technically, deposits are liabilities, and customers can withdraw them at any time. Before the advent of federal deposit insurance, banks faced a real risk of a run like the one dramatized in Frank Capra's 1946 film, "It's a Wonderful Life." But in a world with federal deposit insurance and where transferring an account to a new institution carries exit fees and forces the customer to re-establish a host of convenient features (such as direct deposit, automatic payments, and electronic bill-pay), deposits are sticky. As a practical matter, core deposits provide banks with stable, low-cost financing. As such, core deposits contribute significantly to bank profitability by lessening or eliminating the need for higher-cost financing and enabling banks to earn a wider spread when making longer-term, higher-interest-rate investments, such as real estate loans. Banks also generate fee income from deposit accounts and can leverage their customer relationships to sell other products. Federal regulators view core deposits favorably and believe that "generally, banks' increasing reliance on core deposits reduces the chance of failure and reduces the [Deposit Insurance Fund's] losses when banks do fail." Federal Deposit Insurance Corporation, *Study on Core Deposits and Brokered Deposits* 3 (July 8, 2011), *available at* http://www.fdic.gov/regulations/reform/coredeposit-study.pdf (last visited February 27, 2012). For all of these reasons, banks willingly pay a premium for deposits, typically structured by having the acquiring institution assume a larger quantum of deposits than the assets transferred.

As of December 31, 2010, BankAtlantic held approximately $2.8 billion in core deposits. Bancorp had invested significantly to build that deposit base. Levan testified BankAtlantic's "deposit base is recognized not only in Florida but nationally as being one of the best deposit bases." Tr. 750.

## F. Bancorp Tries To Sell Itself.

Several of the potential bidders in the Tampa process expressed interest in a whole-company acquisition. Encouraged by the overtures, Bancorp embarked on a sale process in fall 2010. Bancorp entered into nondisclosure agreements with at least fifteen parties and had serious discussions with at least four.

Throughout the sale process, one item of concern for all potential bidders was a securities class action pending in the United States District Court for the Southern District of Florida (the "Florida Securities Action"). The plaintiffs in that action alleged that Bancorp and certain of its officers made false and misleading statements about BankAtlantic's loan portfolio and related loss allowances. After the Florida Securities Action was filed, the SEC opened an investigation into the same issues. The SEC later filed a complaint seeking to impose fines on Levan and Bancorp and bar Levan from serving as an officer or director of a public company.

Bancorp management was and remains convinced that the claims advanced by the securities plaintiffs and the SEC are "bogus." Tr. 758. Management expressed this view to bidders and assured them that the litigation posed no risk. Despite management's confidence, in August 2010, the District Court issued a lengthy opinion which, among other rulings, held that Levan made objectively false statements to investors regarding BankAtlantic's loan portfolio and granted partial summary judgment in favor of the plaintiffs. *See In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *26–31 (S.D.Fla. Aug. 18, 2010), *recons. denied*, 2010 WL 6352664 (S.D.Fla. Sept. 9, 2010). During trial in this case, Bancorp's witnesses and its counsel vigorously disputed that ruling. I simply note its occurrence.

With trial in the Florida Securities Action set to begin in October 2010, three of the four remaining bidders declined to submit indications of interest. The fourth bidder ("Bidder 1") expressed interest in purchasing Bancorp for $158.3 million.

On November 18, 2010, the jury in the Florida Securities Action returned a verdict against Bancorp. At that point, "having difficulty getting a handle on the litiga-tion," Bidder 1 indicated that it would reduce its bid to the $50 million range. JX 94 at 11. On November 30, Bidder 1 sent Bancorp a non-binding indication of interest in a transaction at approximately $50 million, representing $.80 per common share (the "Bid Letter").

At trial in this action, Levan derided the Bid Letter as "a bedbug letter" that was "not a serious overture." Tr. 761, 841. According to him,

> Bidder 1 threw out a number, and then about a week later or two weeks later reduced that number in half. Then they reduced it again. Then they increased it a little bit. And we finally just got frustrated and said, "This is not going anywhere," and we terminated that process.

Tr. 756. In presentations to the Bancorp board, Levan described the letter in similar terms and concluded that Bidder 1 "no longer had any intention to buy." Tr. 761. He did not provide the directors with an actual copy of the letter. According to the minutes of a board meeting on December 1, 2010, Levan

> summarized the provisions in the letter including the reduction of the price to 80¢ per share and noted that it remained subject to substantial additional due diligence, the elimination of pre-closing capital from the [Bid Letter] and the absence of severance provisions.... It was noted that due to the content of the [Bid Letter] it did not seem realistic to continue discussions relating to a transaction. Chairman Levan believed that it was time to bring this ongoing process to closure.

JX 94 at 13.

Nothing on the face of the Bid Letter or otherwise in the record indicates that Bidder 1 was not serious. To the contrary, Bidder 1 is a well-known national financial

institution with over $100 billion in assets. The Bid Letter was in customary form. It represented that Bidder 1 had never failed to execute on an announced transaction, and no one has suggested that its claim was incorrect. The due diligence requests that Levan found so troubling asked for additional information about the Florida Securities Action, the SEC investigation, and other ongoing litigation, including easily obtainable materials such as the trial transcripts. Given the risks facing BankAtlantic, the recent adverse jury verdict, and the sharp contrast between the verdict and management's long-standing bullishness on the litigation, these were reasonable requests.

Moreover, contrary to Levan's representation to the board, the Bid Letter contemplated that Bidder 1 would contribute interim capital to Bancorp, and Bidder 1 made clear that it "anticipate[d] that any such capital infusion by [Bidder 1] would be infused between signing and closing of the merger transaction. . . ." JX 369 at 2–3. Also contrary to what Levan told the board, the Bid Letter addressed severance and contemplated "a severance package consistent with the terms and conditions of [Bidder 1's] own severance plans (which recognize credit for years of service). . . ." JX 369 at 2. Quite reasonably, Bidder 1 only contemplated paying severance to those executives who did not continue their employment, *i.e.*, those actually severed. *Id.* Levan, by contrast, demanded that the full executive team receive severance and bonuses "regardless of employment." JX 94 at 3 (minutes of November 13, 2010 board meeting). During a November 15, 2010 meeting, Levan took the position that "management should be compensated [with severance] whether they are retained or not," even after Bidder 1 made clear that it would "reduce the [transaction] price by that difference if [the additional severance] is paid." *Id.* at 5–6. At a November 23, 2010 meeting, Levan advised the board in his capacity as a principal of BFC, the controlling stockholder of Bancorp, that he might consider moving forward at a $115–125 million price, but otherwise he would recommend that BFC veto any transaction. *Id.* at 11. Levan regarded a $50–60 million purchase price as inadequate for Bancorp's equity.

During the December 1 meeting, based on Levan's description of the Bid Letter and his interpretation of Bidder 1's seriousness, the board agreed to terminate negotiations with Bidder 1.

## G. BankAtlantic Sells The Tampa Branches And Deposits.

Shortly after Bancorp terminated the whole-company sale process, PNC Bank contacted Bancorp about purchasing BankAtlantic's Tampa branches and deposits. Levan described his response:

> I was pretty frustrated and pretty disgusted. And I, in a-in a moment of probably part stupidity, part ego, I said, "Well, I'll sell it to you at 10 percent premium." And nobody had gotten a 10 percent premium in this country for deposits in four years, and our other two bids were 2 percent and 4 percent.

Tr. 766. PNC accepted, and on January 28, 2011, Bancorp agreed to sell nineteen branches and $350 million in deposits to PNC. On a book value basis, BankAtlantic transferred approximately $35 million less in cash than the book value of the transferred deposits, generating the 10% premium.

## H. Levan Devises A New Sale Structure.

The sale of the Tampa branches and deposits temporarily buoyed Bancorp's financial results, but not enough to satisfy bank regulators. On February 23, 2011,

the Office of Thrift Supervision[4] required that Bancorp and BankAtlantic enter into Cease and Desist Orders in light of their losses over the past three years, their inadequate capital relative to their risk profile, and BankAtlantic's high levels of classified assets (discussed in greater detail below). Among other things, the Cease and Desist Orders prevented BankAtlantic from paying dividends or transferring any assets to Bancorp without regulatory approval. BankAtlantic was required to increase its capital, meet higher capital ratios than other thrifts, and stop originating commercial real estate loans.

The implicit message of the Cease and Desist Orders seems clear: regulators wanted BankAtlantic to become part of a stronger, better-capitalized franchise. For Levan, however, selling was not attractive. He had just completed a process that generated a single offer of $50 million, which he told his board BFC would block as inadequate. Despite having advised his fellow directors that the offer was "not serious," Levan's intuition told him it was pretty close to market. As Levan explained at trial, "[i]n the best of times you get the two times book value but, clearly, we were not in the best of times, nor were we the best candidate." Tr. 791. A book value metric suggested a sale price of $7–14 million. As an alternative measure, Levan understood that historically buyers would pay up to a 30% premium to market. In the second quarter of 2011, Bancorp's trading price implied a range of $45–79 million. At the time, Levan thought Bancorp realistically could expect $14–48 million for the whole company. Tr. 792–97.

In July 2011, inspired by the deposit premium he had obtained in the Tampa branch transaction, Levan devised a new structure. Bancorp would sell BankAtlantic as a "clean" franchise without any criticized assets and without the Debt Securities. In Levan's words, the pitch would be: "Deposits and performing loans only. No Trups. No classifieds. No non performing." JX 119. As sold, BankAtlantic would be in "pristine condition." JX 121. Bancorp would keep and manage the remaining assets through an entity called "Retained Assets LLC." In essence, Levan was proposing a "good bank/bad bank" structure, a standard technique used by regulators when resolving troubled banks and thrifts.[5]

After Levan decided on this route, Bancorp engaged two financial advisors, Sandler O'Neill & Partners and Cantor Fitzgerald & Co., to contact potential bidders. The "pitch book" outlining the transaction stated that Bancorp was "pursuing the monetization of it's [sic] core banking franchise" and that "existing criticized assets will not be included in the sale." JX 139 at 5. The pitch book advised potential bidders that Bancorp "will only consider a transaction with an 'effective deposit premium' in excess of 10%." Id. at 7. As the pitch book explained, the deposit premium would not be paid in cash, but rather would be conveyed through the exclusion from the sale of criticized assets with a

---

4. The regulatory scene has since changed. Bancorp is now regulated by the Federal Reserve. BankAtlantic is now regulated by the Office of the Comptroller of the Currency and the Federal Deposit Insurance Corporation.

5. Interested readers can find extensive commentary on the "good bank/bad bank" concept. See, e.g., James B. Thomson, Cleaning Up the Refuse From a Financial Crisis: The

Case for a Resolution Management Corporation, 10 Fla. St. U. Bus. Rev. 1, 3–12 (2011); Douglas Faucette et al., Good Bank/Bad Bank, 126 Banking L.J. 291, 292 (2009); Thomas H. Stanton, The Failure of Fannie Mae and Freddie Mac and the Future of Government Support for the Housing Finance System, 18 J.L. & Pol'y 217, 244 (2009).

book value of approximately $600 million (the "Retained Assets"). At closing, BankAtlantic would transfer the Retained Assets to Retained Assets LLC, and "Retained Assets LLC will be distributed to Bancorp simultaneously with the Buyer's purchase of 100% of Bank stock from Bancorp." *Id.* at 6. As of that instant, BankAtlantic would have approximately $3.4 billion in liabilities and $3.1 billion in assets. By purchasing the stock of BankAtlantic, the acquirer would receive an entity with approximately $300 million more in liabilities than assets, resulting in an effective premium of 10%. *Id.* at 7.

The pitch book accurately described the Retained Assets as the consideration for the sale. Levan likewise described the "classified loans to Bancorp" as the "[p]urchase price consideration" paid by the acquirer. JX 120. He explained that the "winning bidder would be the one that allows the most assets to be retained by [Retained Assets LLC]." JX 124.

Beginning in September 2011, Sandler O'Neill and Cantor Fitzgerald contacted twenty-four companies. Nine expressed interest and executed nondisclosure agreements. Three others expressed interest but said they were preoccupied and could not consider a transaction for two or three months. One of the three was Bidder 1. Bancorp did not adjust its timeline to allow any of the three to participate. Bancorp also signaled its unwillingness to consider alternative structures, such as a whole-company sale or a transaction in which the

acquirer would assume the Debt Securities.[6] At least two potential bidders could have benefited from the TruPS, but Bancorp only was interested in a "good bank/bad bank" transaction.

## I. The Sale To BB & T

Only BB & T met Bancorp's demand for a 10% deposit premium. On September 30, 2011, BB & T submitted an indication of interest on that basis. JX 155. On November 1, 2011, BB & T and Bancorp entered into a definitive stock purchase agreement (the "Stock Purchase Agreement" or "SPA"). Bancorp and BB & T never explored any other structures that might have involved assuming the Debt Securities.

Pursuant to the Stock Purchase Agreement, BB & T will acquire all of BankAtlantic's stock (the "Sale Transaction"). At closing, during the mystical singularity of the effective time, BankAtlantic will first transfer assets with a book value of $623.6 million to Retained Assets LLC, then distribute the membership interests in Retained Assets LLC to Bancorp. At that point, Bancorp will transfer the stock of BankAtlantic to BB & T. *See* SPA § 2.3; *see also* Tr. 173, 460–461. As the defendants concede, "[t]he ownership of Retained Assets LLC cannot be divested by BankAtlantic nor owned directly by [Bancorp] until regulatory approval of the Sale Transaction is obtained." Bancorp's Post–Trial Br. ("BPTB") 1 n. 2. Regulators only will approve the transfer of the Retained

---

6. *See, e.g.,* JX 119 at 2 (outlining structure and noting that "it may take a while" to close a deal but that Bancorp "might as well set forth the opportunity and wait for someone to hit the bid"); JX 139 at 7 (sale process summary stating that Bancorp "will *only* consider a transaction with an 'effective deposit premium' in excess of 10%") (emphasis added); JX 254 ("Bancorp instructed its investment bankers to advise bidders that a bid which did

not include at least the amount of the required purchase premium for BankAtlantic and provisions for the distribution to Bancorp of all criticized and other identified assets would not be considered."); Tr. 176–77 (Sandler O'Neill lead banker testifying that Bancorp never offered another structure and consistently took the position that it would not consider any offer with a deposit premium under 10%).

Assets from BankAtlantic to Bancorp because BB & T has agreed to recapitalize BankAtlantic to fill the resulting capital hole. *See* SPA § 5.10.

Through the Sale Transaction, BB & T will gain sole ownership of an entity with approximately $3.4 billion of liabilities and approximately $3.1 billion of assets. The liabilities consist almost entirely of deposits. The assets include approximately $2.1 billion in performing loans, BankAtlantic's network of 78 branches, and Bancorp's 180,000 square foot corporate headquarters building. Post-closing, Bancorp will rent up to 20,000 square feet of office space in its former headquarters from BB & T. Through BankAtlantic, BB & T will own 400,000 customer deposit relationships and all rights to BankAtlantic intellectual property, including the slogan "Florida's Most Convenient Bank." Almost 950 of BankAtlantic's 1,000 full time employees will join BB & T or be severed. Confirming that Bancorp will not be continuing in the traditional banking business, Levan and several other Bancorp executive officers will enter into three-year non-competition agreements prohibiting them from engaging in bank depository activities.

BB & T will not pay Bancorp any cash for BankAtlantic. Rather, the consideration will take the form of the Retained Assets. These consist largely of "criticized assets," meaning those assets that BankAtlantic has categorized as having enhanced credit risk based on regulatory guidelines. The Retained Assets include all of BankAtlantic's loans graded "Special Mention," defined by Bancorp as loans that have "potential weaknesses [which] may result in deterioration of the repayment prospects for the asset" and "deserve management's close attention," but "do not expose the bank to sufficient risk to warrant adverse classification." JX 136 at 10. The Retained Assets also include BankAt-

lantic's "classified" assets, such as all of BankAtlantic's loans and tax certificates that were either "non-performing" or performing but graded as "substandard." According to Bancorp, "substandard" loans are "inadequately protected," have "weaknesses that jeopardize the liquidation of the debt," and "are characterized by the distinct possibility that the bank will sustain loss if the deficiencies are not corrected." *Id.* at 9. The Retained Assets also include all other BankAtlantic-owned real estate, *i.e.*, foreclosed properties.

Retained Assets LLC will have liabilities of $16.7 million and assets with a net book value of $623.6 million. As of September 30, 2011, the Retained Assets consisted of "approximately $271.3 million of performing loans, $315.2 million of non-performing loans, of which $96.5 million were paying as agreed, $18.7 million in tax certificates, $83.4 million of real estate owned, and reserves related to these assets totaling $81.9 million." JX 205 at Ex. 99.1 at 1. Bancorp expects to "earn about $14 million a year on interest" from the Retained Assets. Tr. 62; JX 178. By contrast, BankAtlantic generated $110 million in interest income during the first nine months of 2011. Toalson projects annual post-transaction expenses for Bancorp, including interest on the Debt Securities, of nearly $30 million per year.

## J. The Reaction To The Sale Transaction

Bancorp announced the Sale Transaction on November 1, 2011. Its common stock closed that day at $5.00 per share, an increase of 111% over the prior day's closing price. Under the Stock Purchase Agreement, Bancorp agreed to bring current the $39 million in deferred interest owed on the Debt Securities. SPA § 5.18. Not surprisingly, the market price of the TruPS issued by BBC Capital Trust II,

the only publicly traded series, increased significantly as well, rising by 99.5% from $11.00 to $21.95. After deducting the anticipated payment of $6.51 in deferred interest per share, the TruPS still traded at only 62% of par value.

Despite the market reaction, many TruPS holders were not happy with the deal. On November 22, 2011, Wilmington Trust issued notices of default as Indenture Trustee for BBC Capital Trust II, BBC Capital Trust XI, and BBX Capital Trust 2007 II(a). On November 28, 2011, the non-trustee plaintiffs filed this litigation. On January 6, 2012, Wells Fargo issued notices of default for BBC Capital Trust IX and BBC Capital Trust XII. Both Wilmington Trust and Wells Fargo intervened as additional plaintiffs.

## II. LEGAL ANALYSIS

This case poses two questions: whether the Sale Transaction violates the Successor Obligor Provision, and if so, what is the appropriate remedy. Because of my answers to these questions, I do not reach other issues that the parties have presented, such as the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing or the trustees' proposed alternative forms of relief.

### A. The Successor Obligor Provision

Whether the Sale Transaction complies with the Successor Obligor Provision presents a question of contract law. Seven of the Indentures select New York law to govern their terms. The eighth selects Florida law. The parties have not identified any material difference between New York and Florida law. Because New York law is far more developed, I rely on authorities applying New York law to analyze the case.

### 1. The Interpretation Of A Successor Obligor Provision

 "Successor obligor provisions in bond indentures consist of market-facilitating boilerplate language." *Bank of N.Y. Mellon Trust Co. v. Liberty Media Corp.,* 29 A.3d 225, 241 (Del.2011) (applying New York law). Boilerplate terms in indentures are "not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir. 1982). "Therefore, in interpreting boilerplate indenture provisions, courts will not look to the intent of the parties, but rather the accepted common purpose of such provisions." *Liberty Media,* 29 A.3d at 241 (internal quotation omitted). "Courts strive to give indenture provisions a consistent and uniform meaning because uniformity in interpretation is important to the efficiency of capital markets." *Concord Real Estate CDO 2006–1, Ltd. v. Bank of Am. N.A.,* 996 A.2d 324, 331 (Del. Ch.2010) (internal quotation omitted), *aff'd,* 15 A.3d 216 (Del.2011) (TABLE).

"Courts enhance stability and uniformity of interpretation by looking to the multi-decade efforts of leading practitioners to develop model indenture provisions." *Id.* The authoritative commentary on indenture provisions begins with a 1971 volume, published by the American Bar Foundation, entitled *Commentaries on Model Debenture Indenture Provisions 1965, Model Debenture Indenture Provisions All Registered Issues 1967, and Certain Negotiable Provisions* [hereinafter the *Commentaries* ]. The *Commentaries* "provide powerful evidence of the established commercial expectations of practitioners and market participants." *Concord Real Estate,* 996 A.2d at 331.

Article Eight of the *Commentaries* addresses successor obligor provisions and sets out a model provision comparable in all material respects to those in the Indentures. It states: "The Company shall not ... convey or transfer its properties and assets substantially as an entirety to any Person...." *Commentaries* at 292. The *Commentaries* explain that a covenant of this type is necessary because, if the issuer transferred substantially all of its assets, then "the obligor named in the indenture would cease to operate the business to which, in practical effect, the debenture-holders have looked for payment of the debentures." *Id.* at 423.

■ Courts have described successor obligor provisions in similar terms. In the seminal *Sharon Steel* case, the United States Court of Appeals for the Second Circuit explained that the provisions "protect lenders ... by assuring a degree of continuity of assets." *Sharon Steel*, 691 F.2d at 1050.

> The decision to invest in the debt obligations of a corporation is based on the repayment potential of a business enterprise possessing specific financial characteristics.... Obviously, if the enterprise is changed through ... disposition of assets, the financial characteristics and repayment potential on which the lender relied may be altered adversely.

*Id.* (quoting *Commentaries* at 290). "[A] borrower which sells all its assets does not have an option to continue holding the debt. It must either assign the debt or pay it off." *Id.* At the same time, successor obligor provisions ensure that borrowers have the flexibility to "to sell entire businesses and liquidate, ... or to liquidate their operating assets and enter a new field free of the public debt," so long as the debt is transferred along with substantially all of the assets or is otherwise paid. *Id.* at 1051.

■ New York law teaches that when determining whether a transaction conveys "substantially all" of a company's assets for purposes of a successor obligor provision, courts consider both quantitative and qualitative factors. *HFTP Invs., L.L.C. v. Grupo TMM, S.A.*, 2004 WL 5641710, at *2 (N.Y.Sup.Ct. June 4, 2004), *aff'd*, 18 A.D.3d 369, 795 N.Y.S.2d 555 (2005). At times, the quantitative percentage of assets sold may be so low that examining the qualitative factors is unnecessary. *See, e.g., Sharon Steel*, 691 F.2d at 1051. In the typical case involving a significant sale, however, a court will need to weigh both quantitative and qualitative factors as a totality. Qualitative factors include whether the transaction results in a fundamental change in the nature or character of the entity, involves the entity's primary operating assets, or is out of the ordinary course of business. *See HFTP*, 2004 WL 5641710, at *4.

## 2. Quantitative Factors

■ As reported in its annual report on Form 10–K for the year ended December 31, 2010, the most recent annual filing before the announcement of the Sale Transaction, Bancorp's assets as of that date had a book value of $338.8 million. Bancorp's 100% ownership of the stock of BankAtlantic had a book value of $286.6 million. Using these figures, Bancorp will convey 85% of its assets in the Sale Transaction. As reported in its annual report on Form 10–Q for the quarter ended September 30, 2011, the most recent quarterly filing before the Sale Transaction, the corresponding book value for all of Bancorp's assets was $341.4 million. The book value for all of Bancorp's BankAtlantic stock was $306 million. Using these figures, Bancorp will convey 90% of its assets in the Sale Transaction.

Measuring Bancorp's ownership of BankAtlantic on a book value basis applies a conservative metric by ignoring BankAtlantic's value as a going concern. Nothing in New York law suggests that a court is limited to book value when evaluating a parent corporation's 100% equity interest in an operating subsidiary. A court readily could value a 100% equity interest using other methodologies, such as a discounted cash flow analysis, comparable transactions analysis, or comparable company analysis. A court could take into account factors such as earnings potential and goodwill. Yet even under the conservative book value metric, Bancorp will transfer 85–90% of its assets.

Bancorp objects to these calculations because they use figures for BankAtlantic that include the value of the Retained Assets. Bancorp points out that in the Sale Transaction, it will sell BankAtlantic but keep the Retained Assets. Having structured the Sale Transaction in this manner, Bancorp takes the view that BankAtlantic's stock has negative value at the time of the Sale Transaction and that BB & T is paying zero for BankAtlantic. This theory forms the centerpiece of Bancorp's case.[7]

To get this result, Bancorp starts with a pre-closing book value for BankAtlantic's stock of $306 million. Bancorp then subtracts the $606.9 million net book value of the Retained Assets that will leave BankAtlantic an instant before BB & T acquires its shares, causing BankAtlantic's equity at that climactic moment to have a book value of negative $301 million. Because no cash or other asset will come directly from BB & T's balance sheet, Bancorp argues that BB & T will not pay anything. Consequently, Bancorp concludes it must be conveying zero percent of its assets.

As a threshold matter, Bancorp's position rests on the illogical and counterfactual premise that BankAtlantic (the "good bank") is worth nothing, while Retained Assets LLC (the "bad bank") is worth $606.9 million. Bancorp has it precisely backwards. Buyers actually wanted and were willing to pay a premium for BankAtlantic. Buyers were scared away from and did not want to purchase the Retained Assets. The idea that BankAtlantic will be made less valuable, rather than more valuable, by shedding the Retained Assets is counterintuitive and inherently suspect.

■ In reality, the Retained Assets constitute the consideration for the Sale Transaction. The evidence at trial established this point. Levan, the architect of the transaction, explained in a July 7, 2011, email to his son Jarett and CFO Toalson that the transfer of the "[c]lassified loans to Bancorp" would be the "[p]urchase price consideration." JX 119. In a July 13, 2011, memorandum explaining the structure in greater detail, Levan again stated that "Bancorp would retain all the classi-

---

7. *See, e.g.,* BPTB 1–2 ("BB & T will acquire the thrift stock and pay nothing for it other than its willingness to acquire capital stock in an entity with $300 million more in liabilities than assets. Thus, the net market value of the thrift's stock, including the deposit premium, is zero."); *id.* at 2 ("A sale of an asset with a market value of zero and a negative book value of $300 million, while retaining an asset with a book value of approximately $600 million is not, as a matter of fact, a sale of all or substantially all of the assets of [Bancorp].");

*id.* at 19 ("[T]he effective purchase price for the equity in BankAtlantic is zero ...."); *id.* at 33–34 ("Because the corporate stock being transferred to BB & T will have a net book value of approximately negative $301 million and a market value of zero ... the Sale Transaction is not a sale of all or substantially all of [Bancorp's] assets ...."); *id.* at 36–37 ("[Bancorp] is selling the stock of the thrift in a market value transaction in which it will receive nothing ....").

fied loans as part of the purchase consideration." JX 121. At trial, Levan testified that the "purchase price consideration that BB & T was paying [was] the retained assets that they were allowing Bancorp to obtain at the same time that the deal closed." Tr. 852. Jarett Levan testified that the transfer of Retained Assets LLC was "the purchase price that's being paid by BB & T." Tr. 35. He elaborated: "[T]hey're not paying cash; they're paying with retained assets. . . . They're just transferring the retained assets as the effective purchase price." *Id.* at 36.

Bancorp's financial advisors understood this fact as well. Cantor Fitzgerald rendered an opinion on the financial fairness of the transaction to Bancorp's stockholders. Its underlying analyses "confirm[ed] the fairness of the consideration to be received across a variety of metrics," and Cantor Fitzgerald concluded that the consideration reflected a "[h]igh premium to book value." JX 186 at 9. Cantor Fitzgerald calculated the premium by dividing the net book value of the Retained Assets (computed to be $607 million) by the $306 million book value of Bancorp's investment in BankAtlantic, yielding a Price/Book ratio of 198% ($607 million/$306 million). According to Cantor Fitzgerald, the Sale Transaction favored Bancorp because, in exchange for selling a subsidiary with a positive book value of $306 million, Bancorp received assets with a value that implied an above-market premium based on comparable companies and precedent transactions. Cantor Fitzgerald did not think that Bancorp was getting zero for BankAtlantic.

Sandler O'Neill also rendered an opinion on the financial fairness of the transaction to Bancorp's stockholders. It too understood that Bancorp was receiving positive value from BB & T. When describing the transaction, Sandler O'Neill noted that BB

& T "bears the cost of filling the negative asset value of ($300.9) million plus the cost to recapitalize the balance sheet of $224.3 million (assuming a [Tangible Common Equity/Tangible Assets] ratio of 6.84%) or a total of $538.8 million." JX 194. Sandler O'Neill treated the $538.8 million as an alternative measure of the purchase price that Bancorp received.

I therefore find as a factual matter that the Retained Assets represent the consideration paid by BB & T, just as Levan and his advisors understood it. I would reach the same conclusion as a matter of economic substance. The Sale Transaction is a single, integrated transaction, as Bancorp finally conceded in its post-trial brief. *See* BPTB 1 n. 2 ("this is an integrated transaction"). At the effective time, during the lifespan of a decaying muon, three interrelated transactions will happen sequentially: first, BankAtlantic will transfer the Retained Assets to Retained Assets LLC; second, BankAtlantic will distribute membership interests in Retained Assets LLC to Bancorp; and third, Bancorp will transfer shares of stock in BankAtlantic to BB & T. Contractually under the Stock Purchase Agreement and legally under the Cease and Desist Orders, none of the transactions can take place unless all three take place. In this integrated transaction, Bancorp gives the stock of BankAtlantic and gets membership interests in Retained Assets LLC. One is consideration for the other.

To make this fact plainer, assume that in lieu of criticized assets with a book value of $606 million, the Retained Assets will consist of $606 million in cash. In other words, at closing BankAtlantic would transfer $606 million in cash to Retained Assets LLC, then distribute the equity of Retained Assets LLC to Bancorp an instant before Bancorp would transfer the stock of BankAtlantic to BB & T. Compare

this scenario with a sale transaction in which the only events to take place at closing would be the transfer of BankAtlantic stock to BB & T in return for the transfer of $606 million in cash from BB & T to Bancorp. No one would be fooled into thinking there was any difference in the economic substance of these transactions. Everyone would see that cash was exchanged for stock with the only differences being timing and route. In the first scenario, the cash transfer would occur just before stock transfer, come from BankAtlantic's balance sheet, and be replaced by BB & T post-closing. In the second scenario, the cash transfer would occur just after stock transfer and come directly from BB & T's balance sheet. The same $606 million would change hands in each case.

In the Sale Transaction as actually structured, Retained Assets LLC will own criticized assets with a book value of $606 million rather than $606 million of cash. Reasonable minds can debate whether the Retained Assets are worth $606 million, but no one can legitimately dispute that the Retained Assets are the consideration for the sale of BankAtlantic, just as Levan envisioned and the financial advisors understood. *But see* BPTB 2 (asserting that treating the Retained Assets as consideration "has no factual foundation").

█ With the Retained Assets properly recognized as consideration for the sale of BankAtlantic's stock, it becomes clear that the percentage of assets sold on a book value basis must be calculated by comparing the book value of Bancorp's BankAtlantic stock *including the Retained Assets* with the book value of all of Bancorp's assets. To use the book value of BankAtlantic's stock without the Retained Assets would incorporate into the calculation the consideration that Bancorp received. Under New York law, a court cannot count the consideration the seller received when determining whether a transaction constitutes a sale of substantially all of the seller's assets. "Indeed, if the percentage of assets sold were to be calculated as the difference between the value of pre-sale assets, on the one hand, and the value of post-sale assets plus sale proceeds, on the other, an entity would almost never be deemed to have sold substantially all of its assets...." *HFTP*, 2004 WL 5641710, at *3; *accord Sharon Steel*, 691 F.2d at 1049 (rejecting "literalist" interpretation that proceeds from sale of assets are "assets" such that after a transaction a company would "continue[ ] to own 'all' its 'assets' ... since the proceeds ... went into the [company] treasury"). That the currency for the transaction took a form other than cash (*viz.*, ownership interest in Retained Assets LLC) does not change this principle.

If accepted, Bancorp's "zero consideration" argument would pave an easily traveled superhighway around the substantially all test. Bancorp has conceded that if it sold BankAtlantic to BB & T for $606 million in cash, the transaction would constitute a sale of substantially all its assets. As previously explained, there is no economic difference between a direct stock-for-cash transfer and the Sale Transaction. If routing the consideration through the subsidiary enabled a seller to circumvent a successor obligor provision, future transaction planners could sidestep the restriction whenever a subsidiary had sufficient assets to distribute consideration to the parent. Moreover, transaction planners could create a gift subsidiary with sufficient assets for distribution through the simple expedient of having the subsidiary borrow funds. The subsidiary then would have cash to transfer to "Retained Cash LLC," and the subsidiary could distribute the equity in "Retained Cash LLC" to its parent just

before the parent transferred the stock of the subsidiary to the acquirer. At the moment of transfer, by dint of the outstanding loan, the subsidiary conveniently would have negative book value.

Channeling the consideration through a subsidiary does not change the nature of the deal. From a quantitative standpoint, Bancorp is selling 85–90% of its assets in the Sale Transaction.

### 3. Qualitative Factors

BankAtlantic always has been Bancorp's principal asset and, since February 2007, has been Bancorp's only operating asset. Bancorp was created to hold BankAtlantic, and Bancorp has presented itself to investors on a consolidated basis with BankAtlantic. Although Bancorp previously held Levitt Corporation and Ryan Beck, those entities constituted only a small portion of Bancorp's total assets and were divested before the issuance of the last two series of TruPS. Bancorp has relied at all times on BankAtlantic to service the Debt Securities. As a practical result, "substantially all of [Bancorp's] property," as set forth in Indentures, is synonymous with BankAtlantic.

The Sale Transaction will change fundamentally the nature of Bancorp's business. According to the first page of Bancorp's most recent annual report on Form 10–K, Bancorp is "a Florida-based bank holding company and own[s] BankAtlantic and its subsidiaries." JX 96 at 1. The Form 10–K describes BankAtlantic as Bancorp's "principal asset[ ]." *Id.* The annual report focuses overwhelmingly on the assets and operations of BankAtlantic and minimally on Bancorp's other assets. Through the Sale Transaction, Bancorp will exit the banking business, lose its status as a federally regulated bank holding company, and divest itself of BankAtlantic and its subsidiaries.

Bancorp currently owns 100% of an entity with the following characteristics:
- a valuable brand that is widely recognized as "Florida's Most Convenient Bank";
- "the best [banking] franchise in Florida" (Tr. 749);
- $3.3 billion in deposits that are recognized as "one of the best deposit bases" in the nation (Tr. 750);
- $2.1 billion in performing loans;
- over 1,000 employees;
- 78 physical branches;
- a 180,000 square foot corporate headquarters.

After the Sale Transaction, Bancorp will own 100% of an entity with no brand, no banking franchise, no deposit base, no branches, eight current employees, and a portfolio of criticized assets. It is difficult to imagine a transaction that would have a greater qualitative impact on Bancorp.

Despite this overwhelming evidence, Bancorp contends that it "will maintain a degree of continuity of assets, as ... Retained Assets LLC will continue to hold, invest in, and actively manage a commercial real estate portfolio, wholesale residential loans, and investments including tax certificates." BPTB 25. As a result, Bancorp claims, "Retained Assets LLC will continue most of the lines of business that [Bancorp's] subsidiaries have historically engaged in." *Id.* at 39.

Admittedly there are high-level similarities between the lines of business that BankAtlantic currently conducts and the lines of business in which Retained Assets LLC will engage. That is necessarily true, because the purpose of the Sale Transaction is to strip out the bad assets that BankAtlantic's business has generated and leave them with Retained Assets LLC. But a continuing conceptual resemblance is not sufficient.

The guiding inquiry when evaluating a transaction qualitatively is whether the debtor "would cease to operate the business to which, in practical effect, the debentureholders have looked for payment of the debentures." *Commentaries* at 423. Institutions can share similarities yet have fundamental differences. The Cunard Line and the Cape May–Lewes Ferry both operate ships. Le Bec Fin and Lucky's Coffee Shop both serve dinner. The Massachusetts Institute of Technology and Mt. Pleasant Elementary School both teach students.

A regulated commercial bank and an unregulated investment management company may both be financial institutions, but a lender would not lump them together when evaluating their creditworthiness. In this case, after the Sale Transaction, Bancorp's will have a radically altered risk profile, a transformed asset portfolio, and no regulatory restrictions. It will cease to operate the business to which, in practical effect, the holders of Debt Securities looked for payment. Although Bancorp's attorneys did their best to argue the contrary, Levan pulled back the curtain at trial. He testified that he had "spent [his] entire life working at [BankAtlantic] to make it successful," thought of BankAtlantic as "a Levan family enterprise," and hoped it would remain so for generations. Tr. 731. If Bancorp's business amounted to holding a real estate portfolio, purchasing residential loans, and managing tax certificates, then selling BankAtlantic would be of no moment. Instead, Levan found it "incredibly distressing." Tr. 821.

#### 4. The Sale Transaction Will Breach The Successor Obligor Provision.

From a quantitative perspective, using a conservative book value metric, the Sale Transaction will convey 85–90% of Bancorp's assets. From a qualitative perspec-tive, the Sale Transaction will transform completely the nature of Bancorp's operations. The Sale Transaction is far outside the ordinary course of Bancorp's business. Taken as a whole, the evidence at trial establishes that the Sale Transaction will constitute a transfer of substantially all of Bancorp's assets. Because BB & T is not assuming the Debt Securities, the Sale Transaction will breach the Successor Obligor Provision.

### B. The Remedy

The plaintiffs seek a decree of specific performance enforcing the Successor Obligor Provision and a permanent injunction against the Sale Transaction. In this case, the two remedies are equivalent. Citing Delaware law, the parties agree that the plaintiffs are entitled to a permanent injunction if they have prevailed on the merits, shown that they will suffer irreparable harm if injunctive relief is not granted, and demonstrated that the balance of hardships favors injunctive relief. *See* BPTB 42–43 (citing *Sierra Club v. DNREC*, 2006 WL 1716913, at *3 (Del.Ch. June 19, 2006), *aff'd*, 919 A.2d 547 (Del. 2007)); *accord* Pls.' Post–Trial Br. 40 (citing *Sierra Club* ). The parties join issue over whether a court can issue a decree of specific performance under New York law upon a lesser showing. Because the plaintiffs have earned a permanent injunction under the agreed-upon Delaware standard, I need not address this aspect of specific performance jurisprudence.

#### 1. Success On The Merits

The plaintiffs have established that the Sale Transaction will breach the Successor Obligor Provision and constitute an Event of Default under the Indentures. They have satisfied the requirement of "success on the merits."

## 2. Irreparable Harm

The plaintiffs have demonstrated that they will suffer irreparable harm without an injunction. The Sale Transaction will trigger an Event of Default giving the trustees the right to accelerate the Debt Securities. Upon acceleration, Bancorp will be required to pay immediately the full outstanding amount owed on the Debt Securities. Assuming Bancorp already will have paid the approximately $39 million in deferred interest, the remaining amount due will exceed $290 million.

The evidence at trial, including evidence presented by Bancorp, demonstrates overwhelmingly that Bancorp cannot pay off the accelerated debt. When asked about the possibility of quickly liquidating the Retained Assets, Levan testified frankly: "Well, you can't. That would be suicide." Tr. 814. Toalson testified that she has never analyzed how Bancorp could pay off the Debt Securities in the event of acceleration and did not know of any source that Bancorp could tap for a $290 million payment. A key assumption underlying the Sale Transaction has been that Bancorp will manage and monetize the Retained Assets slowly over time. Because the Sale Transaction will breach the Successor Obligor Provision, Bancorp will not have that luxury. As Levan testified concerning the value of the Retained Assets in a quick sale: "who knows what those numbers are." Tr. 815.

If Bancorp cannot pay the accelerated debt, then in addition to the obvious harm from non-payment, aspects of the Sale Transaction will violate the absolute priority rule. Through the Sale Transaction,

Levan extracted personal consideration for himself and other insiders, moving them to the head of the line. At closing, Bancorp's three most senior executives—Levan, his son Jarett, and Jack Abdo—will receive more than $10 million in severance and non-compete payments, *an amount greater than the total book value of Bancorp's equity as of September 30, 2011.* Neither Levan nor Jarett have an employment contract entitling them to severance payments. Levan will retain his position as a Bancorp executive and conceded at trial that he is not being "severed" from anything. BB & T's CFO testified that BB & T gave Bancorp the option of either making the payments to the executives or increasing the purchase price. Bancorp chose the former. The Sale Transaction payments hearken back to Levan's insistence on severance during the negotiations with Bidder 1, even after Bidder 1 made clear that the increased severance would reduce the purchase price. The payments divert a portion of the deal consideration to Bancorp's controlling stockholders, vaulting them over the Debt Securities and other corporate constituencies.

Finally, even without acceleration, New York law recognizes that "a shift in bargained-for risk may constitute irreparable harm where the lender's only recourse is against the borrower." *Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*, 2010 WL 4449366, at *6 (S.D.N.Y. Oct. 13, 2010). A lender under New York law will be entitled to injunctive relief when the borrower agrees to a transaction that "would shift the risk that the parties contracted to assume." [8] As demonstrated by

---

8. *Citibank, N.A. v. Singer Co.*, 684 F.Supp. 382, 386 (S.D.N.Y.1988); *see U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F.Supp.2d 915, 926 (E.D.N.Y.1999) (finding irreparable harm "since there is a risk that all collectible assets will be dissipated");

*Shearson Lehman Hutton Hldgs. Inc. v. Coated Sales, Inc.*, 697 F.Supp. 639, 642 (S.D.N.Y. 1988) (finding irreparable harm where the lender "bargained for security and loses that security as the result of" the defendant's contractual breaches); *E.W. Bank v. Jung Sun*

the qualitative analysis of the Sale Transaction, the sale of BankAtlantic will alter fundamentally the risk profile of Bancorp as a borrower and shift to the holders of the Debt Securities risks they did not contract to assume.

### 3. Balance Of Hardships

■ The balance of hardships calls for weighing the consequences of an injunction against the consequences of failing to act. Bancorp argues strenuously against relief. According to Bancorp, (i) the status quo is untenable, (ii) an injunction blocking the Sale Transaction will restore the status quo, leading to Bancorp's failure as an entity, and (iii) all of Bancorp's constituencies, including the Debt Securities, will be harmed irreparably by that result. Bancorp bluntly "ask[s] this Court to save Plaintiffs from themselves." BPTB 1.

The apocalyptic picture painted by Bancorp at trial contrasts sharply with the history of the Sale Transaction. On October 4, 2011, when updating the board on the possible sale to BB & T, Levan told the directors that Bancorp would proceed with the sale only if the deal was "agreeable" to Bancorp; otherwise, "the process will be suspended until market conditions improve." JX 161 at 4. Levan never suggested that Bancorp would fail if BankAtlantic did not immediately find a buyer. An internal BankAtlantic memo from November 2011 noted that "BankAtlantic met all capital requirements outlined in the Cease & Desist Order" and that Bancorp "was not compelled to sell BankAtlantic." JX 254 at 4. Since then, Bancorp has maintained its trajectory. If anything, the rate

of decline has decreased. At trial, Bancorp witnesses testified that Florida's real estate market was finally improving and that BankAtlantic's loan portfolio and performance were strengthening. If necessary, Bancorp could continue on its current course for another two years, until the deferred interest on the Debt Securities comes due in the first half of 2014.

Bancorp appears to have Indenture-compliant alternatives. Levan did not testify credibly at trial when he asserted that a whole-company sale is "impossible." Tr. 798. In support, Levan cited Bancorp's experience with Bidder 1, but the record demonstrates that Levan did not want to proceed further with Bidder 1 because the transaction did not meet his personal bottom line. The board broke off discussions with Bidder 1 after Levan (i) told the board that BFC would not support a transaction that delivered less than $115–125 million, (ii) incorrectly described the terms of the Bid Letter, and (iii) refused to recognize the commercial reasonableness of Bidder 1's requests for supplemental legal due diligence. Although Levan told Bancorp's directors that a $50 million number was not a serious offer, he developed the "good bank/bad bank" strategy precisely because he recognized that this figure fell in the middle of what traditional rules of thumb suggested an acquirer would pay and at the high end of the $14–48 million that Bancorp realistically might achieve.

Bancorp has not pointed to any developments that would impair its ability to achieve an Indenture-compliant transaction at a realistic value for Bancorp's equi-

*Laundry Gp. Corp.*, 2010 WL 5252848, at *5 (N.Y.Sup.Ct. Dec. 15, 2010) (finding irreparable harm where "the limitations in the Loan Agreements regarding transfer of the Collateral [were included] to ensure that Plaintiff had ready access to the Property that serves as its security interest under the Loans"); *Nat'l Sur.*

*Corp. v. Titan Constr. Corp.*, 26 N.Y.S.2d 227, 230 (N.Y.Sup.Ct.1940) ("The damage resulting from the failure to give security is not ascertainable, and the legal remedy is therefore inadequate."), *aff'd*, 260 A.D. 911, 24 N.Y.S.2d 141 (1940).

ty. Bidder 1 was prepared to engage in such a transaction. In addition, under current banking regulations, bank holding companies with less than $15 billion in assets can benefit from the TruPS by treating them as Tier I capital. At least two of the potential bidders in the process that led to the Sale Transaction could have taken advantage of this regulatory benefit. During the process, however, Bancorp made clear that it was pursuing the "good bank/bad bank" structure and never opened the door to a transaction in which the acquirer would assume the Debt Securities. Admittedly there is a risk that Bancorp will fail without the Sale Transaction, but it is far from clear that failure is imminent or that Bancorp lacks other options. As Bancorp's Chairman and a principal of Bancorp's controlling stockholder, Levan has powerful economic incentives to find an alternative.

In any event, this is a contract case, and a party cannot "abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts." *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.,* 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37, 42 (1968). "[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *Id.,* 296 N.Y.S.2d 338, 244 N.E.2d at 41.

Parties who enter into lawful contracts are entitled to enforce their rights. Lenders can insist on repayment, even if it forces the debtor into bankruptcy. The public has a strong interest in seeing that contract and property rights are respected. This is particularly so for indentures, which provide the holders of unsecured debt with their only protections.

Companies will find it more costly and difficult to raise financing if the contractual protections in an indenture can be ignored when the issuer faces financial difficulty. That is precisely when creditors most need their contract rights.

Companies also will find it more difficult and more costly to raise financing if subsequent purchasers of debt cannot enforce contract rights to the same degree as the original investors. Bancorp has suggested that because certain non-trustee plaintiffs acquired their TruPS at a discount from par value, after Bancorp began to suffer financially, they are "vultures" who should not be granted equitable relief. Ironically, in early 2010, Bancorp offered to purchase TruPS at twenty cents on the dollar.

Bancorp's objection does not apply to the trustee plaintiffs, nor to non-trustee plaintiffs Trapeza CDO I, LLC, Trapeza CDO II, LLC and Trapeza CDO III, LLC who hold over $25 million in TruPS purchased at par. Bancorp has not articulated any reason why an investor who purchases a debt security at a discount should be denied its contractual protections, nor any standard for determining when or to what degree a "vulture defense" would apply. A selective approach to contract enforcement would harm the ability of issuers to access the debt markets. Initial purchasers would pay less knowing that secondary purchasers would discount the securities for the less valuable rights they would receive. Although perhaps convenient for a particular defendant in a particular case, a "vulture defense" would do more harm than good.

Bancorp's equity holders had the right to reject a whole-company transaction with Bidder 1 because they felt the transaction did not provide them with adequate consideration. Bancorp's officers and directors likewise were free to seek out an alternative transaction that could provide greater

consideration for the equity holders. What Bancorp's officers and directors cannot do is extract value over time to benefit themselves and the equity through a transaction that violates clear contractual rights in the Indentures. Just as Bancorp's equity holders could exercise their voting rights to block the transaction with Bidder 1, the Trusts can stand on their contract rights when faced with the Sale Transaction.

Having considered the risks to Bancorp and its constituencies from an injunction, and having weighed those risks against the irreparable harm that the holders of Debt Securities will suffer if an injunction does not issue, I find that the balance decidedly favors relief.

## III. CONCLUSION

The Sale Transaction constitutes a breach of the Successor Obligor Provision, results in an Event of Default, and will inflict irreparable harm on the plaintiffs. The balance of hardships favors the issuance of permanent injunctive relief. Accordingly, I have entered contemporaneously an order enjoining Bancorp permanently from completing the Sale Transaction.

**Appendix A**

| Trust | Successor Obligor Provisions |
|---|---|
| BBC Capital Trust II (JX 3) | Section 5.5 Compliance with Consolidation Provisions. The Company shall not, while any of the Debentures remain outstanding, . . . sell, convey, transfer or lease all or substantially all of its property or assets to, any other company unless the provisions of Article XII hereof are complied with.<br>Section 12.1 Company May Consolidate, Etc. Nothing contained in this Indenture or in any of the Debentures . . . shall prevent any sale, conveyance, lease, transfer or other disposition of the property and assets of the Company, as the case may be, or its successor or successors as an entirety, or substantially as an entirety, to any other corporation (whether or not affiliated with the Company, as the case may be, or its successor or successors) authorized to acquire and operate the same; provided, however, the Company hereby covenants and agrees that, (i) upon any such . . . sale, conveyance, lease, transfer or other disposition, the due and punctual payment, in the case of the Company, of the principal of and interest on all of the Debentures, according to their tenor and the due and punctual performance and observance of all the covenants and conditions of this Indenture to be kept or performed by the Company as the case may be, shall be expressly assumed, by supplemental indenture (which shall conform to the provisions of the Trust Indenture Act, as then in effect) satisfactory in form to the Trustee executed and delivered to the Trustee . . . by the entity which shall have acquired such property. . . . |
| BBC Capital Trust V (JX 8) | Section 8.1. Company May Consolidate, Etc., Only on Certain Terms. The Company shall not . . . convey, transfer or lease its properties and assets substantially as an entirety to any Person, . . . unless:<br>(a) if the Company shall . . . convey, transfer or lease its properties and assets substantially as an entirety to any Person, . . . the Person that acquires by conveyance or transfer, or that leases, the properties and assets of the Company substantially as an entirety . . . shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, the due and punctual payment of the principal of and any premium and interest (including any Additional Interest) on all the Securities and the per- |

| | |
|---|---|
| | formance of every covenant of this Indenture on the part of the Company to be performed or observed.... |
| BBC Capital Trust VI (JX 13) | Section 8.1. Company May Consolidate, Etc., Only on Certain Terms. The Company shall not ... convey, transfer or lease its properties and assets substantially as an entirety to any Person, ... unless:<br>(a) if the Company shall ... convey, transfer or lease its properties and assets substantially as an entirety to any Person, ... the Person that acquires by conveyance or transfer, or that leases, the properties and assets of the Company substantially as an entirety ... shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, the due and punctual payment of the principal of and any premium and interest (including any Additional Interest) on all the Securities and the performance of every covenant of this Indenture on the part of the Company to be performed or observed.... |
| BBC Capital Trust IX (JX 14) | Section 3.07. Compliance with Consolidation Provisions. The Company will not, while any of the Debt Securities remain outstanding, ... sell or convey all or substantially all of its property to any other Person unless the provisions of Article XI hereof are complied with.<br>Section 11.01. Company May Consolidate, etc., on Certain Terms. Nothing contained in this Indenture or in the Debt Securities ... shall prevent any sale, conveyance, transfer or other disposition of the property or capital stock of the Company or its successor or successors as an entirety, or substantially as an entirety, to any other Person (whether or not affiliated with the Company, or its successor or successors) authorized to acquire and operate the same; provided, however, that the Company hereby covenants and agrees that, upon any such ... sale, conveyance, transfer or other disposition, the due and punctual payment of all payments due on all of the Debt Securities in accordance with their terms, according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this Indenture to be kept or performed by the Company, shall be expressly assumed by supplemental indenture reasonably satisfactory in form to the Trustee executed and delivered to the Trustee ... by the entity which shall have acquired such property or capital stock. |
| BBC Capital Trust XI (JX 25) | Section 3.07. Compliance with Consolidation Provisions. The Company will not, while any of the Debt Securities remain outstanding, ... sell or convey all or substantially all of its property to any other Person unless the provisions of Article XI hereof are complied with.<br>Section 11.01. Company May Consolidate, etc., on Certain Terms. Nothing contained in this Indenture or in the Debt Securities ... shall prevent any sale, conveyance, transfer or other disposition of the property or capital stock of the Company or its successor or successors as an entirety, or substantially as an entirety, to any other Person (whether or not affiliated with the Company, or its successor or successors) authorized to acquire and operate the same; provided, however, that the Company hereby covenants and agrees that, upon any such ... sale, conveyance, transfer or other disposition, the due and punctual payment of all payments due on all of the Debt Securities in accordance with their terms, according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this Indenture to be kept or performed by the Company, shall be expressly assumed by supplemental indenture reasonably satisfactory in form to the Trustee executed and delivered to the Trustee ... by the entity which shall have acquired such property or capital stock.... |

| | |
|---|---|
| BBC Capital Trust XII (JX 20) | Section 3.07. Compliance with Consolidation Provisions. The Company will not, while any of the Debt Securities remain outstanding, ... sell or convey all or substantially all of its property to any other Person unless the Provisions of Article XI hereof are complied with.<br><br>Section 11.01. Company May Consolidate, etc., on Certain Terms. Nothing contained in this Indenture or in the Debt Securities ... shall prevent any sale, conveyance, transfer or other disposition of the property or capital stock of the Company or its successor or successors as an entirety, or substantially as an entirety, to any other Person (whether or not affiliated with the Company, or its successor or successors) authorized to acquire and operate the same; provided, however, that the Company hereby covenants and agrees that, upon any such ... sale, conveyance, transfer or other disposition, the due and punctual payment of all payments due on all of the Debt Securities in accordance with their terms, according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this Indenture to be kept or performed by the Company, shall be expressly assumed by supplemental indenture reasonably satisfactory in form to the Trustee executed and delivered to the Trustee ... by the entity which shall have acquired such property or capital stock. |
| BBX Capital Trust 2007 I(a) (JX 45) | Section 3.07. Compliance with Consolidation Provisions. The Company will not, while any of the Debt Securities remain outstanding, ... sell, convey, transfer or otherwise dispose of all or substantially all of its property or capital stock to any other Person unless the provisions of Article XI hereof are complied with.<br><br>Section 11.01. Company May Consolidate, etc., on Certain Terms. Nothing contained in this Indenture or in the Debt Securities ... shall prevent any sale, conveyance, transfer or other disposition of all or substantially all of the property or capital stock of the Company or its successor or successors to any other Person (whether or not affiliated with the Company, or its successor or successors) authorized to acquire and operate the same; provided, however, that the Company hereby covenants and agrees that, (i) upon any such ... sale, conveyance, transfer or other disposition, the successor entity shall be an entity organized and existing under the laws of the United States or any state thereof or the District of Columbia ... and such entity expressly assumes all of the obligations of the Company under the Debt Securities, this Indenture, the Capital Securities Guarantee and the Declaration.... |
| BBX Capital Trust 2007 II(a) (JX 55) | Section 3.7. Compliance with Consolidation Provisions. The Company will not, while any of the Debentures remain outstanding, ... sell or convey all or substantially all of its property to any other Person unless the provisions of Article XI hereof are complied with.<br><br>Section 11.1. Company May Consolidate, etc., on Certain Terms. Nothing contained in this Indenture or in the Debentures ... shall prevent any sale, conveyance, transfer or other disposition of the property of the Company or its successor or successors as an entirety, or substantially as an entirety, to any other Person (whether or not affiliated with the Company, or its successor or successors) authorized to acquire and operate the same; provided, however, that the Company hereby covenants and agrees that, upon any such ... sale, conveyance, transfer or other disposition, the due and punctual payment of the principal of (and premium, if any) and interest on all of the Debentures in accordance with their terms, according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this Indenture to be kept or performed by the Company, shall be expressly assumed by supplemental indenture satisfactory in |

form to the Trustee executed and delivered to the Trustee ... by the entity which shall have acquired such property.

| Trust | Event of Default and Acceleration Provisions |
|---|---|
| BBC Capital Trust II (JX 3) | Section 7.1 Events of Default. (a) Whenever used herein with respect to the Debentures, "Event of Default" means any one or more of the following events that has occurred and is continuing:<br><br>. . .<br><br>(vii) the Company fails to observe or perform any other of its covenants or agreements with respect to the Debentures for a period of 90 days after the date on which written notice of such failure, requiring the same to be remedied and stating that such notice is a "Notice of Default" hereunder, shall have been given to the Company by the Trustee, by registered or certified mail, or to the Company and the Trustee by the holders of at least 25% in principal amount of the Debentures at the time outstanding.<br><br>. . .<br><br>(b) In each and every such case ... either the Trustee or the holders of not less than 25% in aggregate principal amount of the Debentures then Outstanding hereunder ... may declare the principal of and the interest on all the Debentures, including any Compounded Interest, Additional Interest, if any, and any other amounts payable under this Indenture, to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, notwithstanding anything contained in this Indenture or in the Debentures. |
| BBC Capital Trust V (JX 8) | Section 5.1. Events of Default. "Event of Default" means, wherever used herein with respect to the Securities, any one of the following events . . .:<br><br>. . .<br><br>(c) default in the performance, or breach, of any covenant or warranty of the Company in this Indenture and continuance of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the Holders of at least twenty five percent (25%) in aggregate principal amount of the Outstanding Securities a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder. . . .<br>Section 5.2. Acceleration of Maturity; Rescission and Annulment. (a) If an Event of Default occurs and is continuing, then and in every such case the Trustee or the Holders of not less than twenty five percent (25%) in aggregate principal amount of the Outstanding Securities may declare the principal amount of all the Securities to be due and payable immediately ... and upon any such declaration the principal amount of and the accrued interest (including any Additional Interest) on all the Securities shall become immediately due and payable. |
| BBC Capital Trust VI (JX 13) | Section 5.1. Events of Default. "Event of Default" means, wherever used herein with respect to the Securities, any one of the following events . . .:<br><br>. . .<br><br>(c) default in the performance, or breach, of any covenant or warranty of the Company in this Indenture and continuance of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the Holders of at least twenty five percent (25%) in aggregate principal amount of the Outstanding Securi- |

ties a written notice specifying such default or breach and requiring it to be remedied and· stating that such notice is a "Notice of Default" hereunder....

Section 5.2. Acceleration of Maturity; Rescission and Annulment. (a) If an Event of Default occurs and is continuing, then and in every such case the Trustee or the Holders of not less than twenty five percent (25%) in aggregate principal amount of the Outstanding Securities may declare the principal amount of all the Securities to be due and payable immediately ... and upon any such declaration the principal amount of and the accrued interest (including any Additional Interest) on all the Securities shall become immediately due and payable.

| | |
|---|---|
| BBC Capital Trust IX (JX 14) | Section 5.01. Events of Default. The following events shall be "Events of Default" with respect to Debt Securities: . . . (c) the Company defaults in the performance of, or breaches, any of its covenants or agreements in Sections 3.06, 3.07, 3.08 or 3.09 of this Indenture (other than a covenant or agreement a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 90 days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the holders of not less than 25% in aggregate principal amount of the outstanding Debt Securities, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder.... . . . If an Event of Default occurs and is continuing with respect to the Debt Securities, then, and in each and every such case, ... either the Trustee or the holders of not less than 25% in aggregate principal amount of the Debt Securities then outstanding hereunder ... may declare the entire principal of the Debt Securities and the interest accrued, but unpaid, thereon, if any, to be due and payable immediately; and upon any such declaration the same shall become immediately due and payable. |
| BBC Capital Trust XI (JX 25) | Section 5.01. Events of Default. The following events shall be "Events of Default" with respect to Debt Securities: . . . (c) the Company defaults in the performance of, or breaches, any of its covenants or agreements in Sections 3.06, 3.07, 3.08 or 3.09 of this Indenture (other than a covenant or agreement a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 90 days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the holders of not less than 25% in aggregate principal amount of the outstanding Debt Securities, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder.... . . . If an Event of Default occurs and is continuing with respect to the Debt Securities, then, and in each and every such case, ... either the Trustee or the holders of not less than 25% in aggregate principal amount of the Debt Securities then outstanding hereunder ... may declare the entire principal of the Debt Securities and the interest accrued, but unpaid, thereon, if any, to be due and payable immediately, and upon any such declaration the same shall become immediately due and payable. |

| | |
|---|---|
| BBC Capital Trust XII (JX 20) | Section 5.01. Events of Default. The following events shall be "Events of Default" with respect to Debt Securities:<br><br>. . .<br>(c) the Company defaults in the performance of, or breaches, any of its covenants or agreements in Sections 3.06, 3.07, 3.08 or 3.09 of this Indenture (other than a covenant or agreement a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 90 days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the holders of not less than 25% in aggregate principal amount of the outstanding Debt Securities, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder. . . .<br><br>. . .<br>If an Event of Default occurs and is continuing with respect to the Debt Securities, then, and in each and every such case, . . . either the Trustee or the holders of not less than 25% in aggregate principal amount of the Debt Securities then outstanding hereunder . . . may declare the entire principal of the Debt Securities and the interest accrued, but unpaid, thereon, if any, to be due and payable immediately, and upon any such declaration the same shall become immediately due and payable. |
| BBX Capital Trust 2007 I(a) (JX 45) | Section 5.01. Events of Default. The following events shall be "Events of Default" with respect to Debt Securities:<br><br>. . .<br>(d) the Company defaults in the performance of, or breaches, any of its covenants or agreements in Sections 3.06, 3.07, 3.08 or 3.09 of this Indenture (other than a covenant or agreement a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 30 days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the holders of not less than 25% in aggregate principal amount of the outstanding Debt Securities, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder. . . .<br><br>. . .<br>If an Event of Default specified under clause (c) of this Section 5.01 occurs and is continuing with respect to the Debt Securities, then, and in each and every such case, . . . either the Trustee or the holders of not less than 25% in aggregate principal amount of the Debt Securities then outstanding hereunder . . . may declare the entire principal of the Debt Securities and any premium and interest accrued, but unpaid, thereon, if any, to be due and payable immediately, and upon any such declaration the same shall become immediately due and payable. . . . Notwithstanding anything to the contrary in this Section 5.01, if at any time during the period in which this Indenture remains in force and effect, the Company ceases or elects to cease to be subject to the supervision and regulations of the Federal Reserve, OTS, OCC or similar regulatory authority overseeing bank, thrift, savings and loan or financial holding companies or similar institutions requiring specifications for the treatment of capital similar in nature to the capital adequacy guidelines under the Federal Reserve rules and regulations, then the first sentence of this paragraph shall be deemed to include clauses (a), (b) and (d) under this Section 5.01 as an Event of Default resulting in an acceleration of payment of the Debt Securities to the same extent as provided herein for clause (c). |

| Trust | Specific Performance Provisions |
|---|---|
| BBX Capital Trust 2007 II(a) (JX 55) | Section 5.1. Events of Default. "Event of Default," wherever used herein, means any one of the following events . . .: <br><br> . . . <br> (c) the Company defaults in the performance of, or breaches, any of its covenants or agreements in this Indenture or in the terms of the Debentures established as contemplated in this Indenture (other than a covenant or agreement a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 60 days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the outstanding Debentures, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder. . . . <br><br> . . . <br> If an Event of Default under Section 5.1(b) or (c) occurs and is continuing with respect to the Debentures, then, and in each and every such case, unless the principal of the Debentures shall have already become due and payable, either the Trustee or the holders of not less than 25% in aggregate principal amount of the Debentures then outstanding hereunder, by notice in writing to the Company (and to the Trustee if given by Securityholders), may proceed to remedy the default or breach thereunder by such appropriate judicial proceedings as the Trustee or such holders shall deem most effectual to remedy the defaulted covenant or enforce the provisions of this Indenture so breached, either by suit in equity or by action at law, for damages or otherwise.[9] |
| BBC Capital Trust II (JX 3) | Section 7.2 Collection of Indebtedness and Suits for Enforcement by Trustee. <br><br> . . . <br> (d) . . . In case of an Event of Default hereunder, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either at law or in equity or in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law. |
| BBC Capital Trust V (JX 8) | Section 5.3. Collection of Indebtedness and Suits for Enforcement by Trustee. <br><br> . . . <br> (c) If an Event of Default with respect to Securities occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Securities by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy. |
| BBC Capital Trust VI (JX 13) | Section 5.3. Collection of Indebtedness and Suits for Enforcement by Trustee. <br><br> . . . |

9. The acceleration language in this provision differs from the other Indentures, but the parties did not advance any arguments on that basis.

| | |
|---|---|
| | (c) If an Event of Default with respect to Securities occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Securities by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy. |
| BBC Capital Trust IX (JX 14) | Section 5.05. Proceedings by Trustee. In case of an Event of Default hereunder the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law. |
| BBC Capital Trust XI (JX 25) | Section 5.05. Proceedings by Trustee. In case of an Event of Default hereunder the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law. |
| BBC Capital Trust XII (JX 20) | Section 5.05. Proceedings by Trustee. In case of an Event of Default hereunder the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law. |
| BBX Capital Trust 2007 I(a) | (JX 45)<br><br>Section 5.05. Proceedings by Trustee. In case of an Event of Default hereunder the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law. |
| BBX Capital Trust 2007 II(a) (JX 55) | Section 5.5. Proceedings by Trustee. In case of an Event of Default hereunder the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this |

Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.